W. H. COBBS AND ANOTHER V. C. COLEMAN.

Where the ordinary remedy for carrying a case from a Justice's Court to the District Court, was by *certiorari*, grantable by a Judge, to be applied for within ninety days after the judgment of the Justice, and the Legislature passed an Act authorizing the Clerks of the District Courts to issue writs of *certiorari* in such cases ; and the party obtained a *certiorari* from the Clerk, but after the ninety days had elapsed, the Supreme Court decided the latter law to be unconstitutional, it was held that the mistake of law was sufficient to excuse the party for not having obtained a *certiorari*, in due time, from the District Judge, and that he was therefore entitled, upon a showing of merits, to claim the interposition of the equitable power of the District Court, by injunction.

It seems that where a Constable makes a return of no property, his securities are not liable beyond an amount equal to the value of such property as is proved to have belonged to the defendant, within the county, subject to execution.

The exemption of property from execution, by the Act of 1839, in favor of "every

citizen or head of a family" extends to all *inhabitants* of the State, married or single, and is still in force.

The exemption of a horse from execution, by the Act of 1839, includes everything absolutely essential to its beneficial enjoyment, as bridle, saddle and martingale.

Appeal from Harrison. The judgment in the Justice's Court was rendered on the 7th of August, 1852. The decision of the Supreme Court, on the constitutionality of the *certiorari* law of 1852, was made at Austin Term, 1852, which commenced on the first Monday in November.

*W. H. S. Bristow*, for appellant.

*J. M. Clough*, for appellee.

HEMPHILL, CH. J. This was a suit for injunction against a judgment from a Magistrate's Court. The petitioners aver that they applied for and obtained a writ of *certiorari*, from the Clerk of the District Court, under the act of February 10th, 1852, but that after the law had been adjudged unconstitutional, by the Supreme Court, the cause was, on motion of defendant, dismissed; that more than ninety days had then elapsed, from the date of the judgment; that the failure to apply for a writ of *certiorari*, from the District Court, in proper time, had arisen from their mistake in bringing up the cause under the law of the 10th of February, 1852. Many grounds were set forth for the relief. The injunction was issued; but on the coming in of the answer, it was dissolved, and the petition dismissed. The first question is, whether the mistake of the plaintiffs, as to the validity of the writ of *certiorari*, under the law of 1852, would give them a right to bring up the cause in this mode, on a showing of sufficient grounds for the grant of a new trial; and we are of opinion that this must be answered in the affirmative.

The plaintiffs, in bringing up the cause by *certiorari*, issued from the Clerk, relied, by mistake, upon the validity of a Stat-

ute of the Legislature; and although it may be said that the common maxim is, that "ignorance of the law excuses no man," yet this is founded on the presumption that every one knows the law. This presumption, at least, has very slight foundation in truth, and is sustainable only from its necessity to the best interest of society. But, though knowledge of the law, Statute and Common, may be presumed, yet it would be straining the presumption quite too far, to hold that every person is a constitutional lawyer and (in the language of appellant's counsel,) capable of deciding questions between constitutional provisions and legislative enactments.

But it is unnecessary to state, in detail, the reasons why such mistake of the law, as that made by the plaintiffs, should not operate to their prejudice, as the point, in relation to a like mistake, was decided in the case of Miller, adm'r, v. Hall, 12 Texas, 556.

There, an appeal was taken from a judgment of a Justice, before the law authorizing such appeal was pronounced unconstitutional, and it was held in substance, that the right of the appellant, to a new trial, should not be thereby prejudiced, provided he could not have, by reasonable diligence, been apprised of the decision, until too late to prosecute the ordinary remedy by *certiorari*.

There is no doubt that the appellants, in this case, were not apprised, until after the expiration of the statutory limit for *certiorari*, that the law, under which they were prosecuting their rights, had been pronounced unconstitutional; and we are of opinion that the fact of their not suing out a legal writ of *certiorari*, in the proper time, should not defeat their right to a new trial, provided their shewing of merits be otherwise sufficient.

The appellants allege various grounds for a new trial, of which I shall consider but one; and I will refer to some of the facts of the case, that this may be understood. The appellants were sureties of one Mansfield Garret, a Constable, in whose hands had been lodged a writ of attachment against

one Edward S. Waggoner, at the instance of Charles Coleman, the appellee in this Court. Upon which writ the said Garret, the Constable, returned, "no property found." The said Coleman then sued the Constable, and the appellants as his sureties, as for a false return. It was proved on the trial, that the only property which Waggoner had, was a horse, saddle and bridle, and perhaps martingale. Waggoner, himself, it appears from the answer, was a witness; and the facts stated, are drawn as well from the answer as the petition. Judgment was given for the whole debt; and the question to be considered is, whether the property of Waggoner was exempt from execution—for if so, the return was not false ; and if any portion was not exempt, the appellants would be liable to the extent of its value, but not for the whole debt. That the horse, at least, was exempt from execution, and consequently from levy under the attachment, is beyond question. The act of 1839 (Hart. Dig., Art. 1270) declares that there shall be reserved to every citizen or head of a family in this Republic, free and independent of the power of a writ of *fieri facias* or other execution, certain property specified, among which is one horse.

The petition avers, and this is admitted in one part of the answer, that it was proved Waggoner never had owned more than one horse at a time since he became a citizen of Texas ; and the defendant answers that he does not remember that there was any proof of Waggoner's citizenship. This was not essential or necessary ; for, although the Statute employs the phrase " every citizen," yet this is not to be taken in a restricted sense, as designating only the native born or naturalized citizen, but in its general acceptation and meaning, as descriptive of the inhabitants of the country. There is no evidence as to whether Waggoner was a single man or the head of a family ; but this was immaterial, for the Statute extends as well to single men, or individuals, as to married men, or heads of families. The terms are, every citizen or head of a family—that is every individual independent of,

and not properly connected with, a family, as one of its members, and every head of a family, shall be entitled, &c. In a subsequent part of the Section, it is declared, that there shall be reserved all tools, apparatus and books belonging to the trade or profession of any citizen, without referring specifically to heads of families. It is very clear that no distinction, in this Act, is made between single men and heads of families. The citizen, whether he be single or the head of a family, shall have his homestead under this Act, and the other articles enumerated, exempt from execution. The homestead, exempted by the Constitution, is reserved for heads of families ; but not so, the exemptions of this Statute, and even the constitutional homestead may be vested in a single person, as in case of the decease of a husband, leaving a widow without any children, or of a father, leaving but one child—the homestead of the Constitution, and in fact, all property exempt from execution, is to be set apart for such widow or such child, as the case may be. (Id. 1154.) It may be well to observe that at the passage of the Act of 1839, the laws of Spain were in force, and by these, there were many exemptions. There is no reference here, but the Institutes of Aso & Manuel, as found in White, and from these it appears, that among the reservations were implements and beasts of husbandry, bread of bakers, tools of artificers, books of advocates and students, beds, wearing apparel and other things necessary for daily use. Nothing is said about single men or heads of families. (1 White, 322–323.)

It appears, then, from the Statute, that Waggoner's horse was not liable to the attachment. The question is, whether exemption of the horse will extend to the saddle and bridle. It is very clear that by these reservations, the Legislature intended a real, substantial benefit. A horse was not reserved because he was a horse, but because of his useful qualities and his almost indispensable services ; but what would be the benefit of a horse, without shoes, or without saddle and bridle, or without gears if employed for purposes of agriculture. It

cannot be presumed that the Legislature intended that a debtor should be reduced to the most primitive usage of riding without saddle or bridle ; yet, this may often be the only alternative, if such appendages be held not exempt from execution. It would seem that by fair construction, the grants in the Statute must include, not only the subject itself, but every thing absolutely essential to its beneficial enjoyment. As, for instance, the grant of the five milch cows must include the calves during the season of milking, though this is not expressed in the Act. Implements of husbandry and tools, apparatus, &c., belonging to a trade or profession, are reserved. Now, what more necessary implement of husbandry than a bridle to a plough horse? or what more necessary apparatus can there be, to any trade, than a saddle to an owner of a horse, and especially in this State, where, as a general rule, every man rides, and where there is more necessity for such service from the horse, than in other States? A bridle and saddle are as indispensable to the use of a horse, as a yoke is to a pair of oxen. They must be regarded as included within the grant, and as, consequently, exempt from execution. Of course, these articles must be of a plain description. All the implements of husbandry are not allowed to exceed fifty dollars in value, and the whole policy of the Act is, to subtract no more from the creditor, than is essential to the moderate support of the debtor ; and while the law would not permit the horse to be so stripped as to be almost valueless, nor suffer the spirit of the freeman, who owns him, to be exposed to unnecessary humiliation, yet extravagance would not be justified, and bridles and saddles, beyond a reasonable value, might be exposed to seizure  As to martingales, the maxim of *de minimis non curat lex* may very well apply. They are not so generally essential as a bridle and saddle, but they may frequently, and to save executive officers from difficulties, who can have no certain tests, martingales may be regarded as included within the reservation of the horse.

Mr. Waggoner had, therefore, no property on which the

attachment could be levied, and the return of no property found being true, there was no foundation for the action.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be in all things reversed, and the cause be remanded for further proceedings according to law.

Reversed and remanded.