Williams v. Jenkins.

W. H. WILLIAMS, ADMINISTRATOR, AND OTHERS, V. E. E. JEN-
KINS, ADMINISTRATRIX.

The limitation contained in the constitutional provision as to the value of a
town or city lot, or lots, as a homestead exempt from forced sale, has refer-
ence to their value inclusive of the improvements upon them.

APPEAL from Galveston. Tried below before the Hon. Peter
W. Gray.

Ellen E. Jenkins, the widow of Henry Jenkins, deceased, made
application to the County Court, in behalf of herself and her two
minor children, to set apart to them the homestead and other
property exempt from forced sale by the constitution and laws of
the State. The homestead consisted of three lots in the city of
Galveston, which cost in the aggregate $1500, and were purchased
with a view to their constituting a homestead. The residence was
built in the year 1854, and was occupied as a homestead until
the death of the deceased. The present value of the lots, unim-
proved, is $1000 each. The improvements thereon are of the
value of $3000. The property at the time of the application
was subject to a prior lien of $2000. Almost the whole of the
improvements are on the two eastern lots; which two lots the
widow proposed to take as her homestead subject to the prior lien,
to be paid first out of the third, or remaining lot, and if that was
not sufficient, then out of the two lots aforesaid. The County
Court decided that the two lots with the improvements, being
worth over $2000, the only interest which the widow and children
could claim, was the amount of $2000, to be raised out of the
property,—though it gave her the option of retaining the home-
stead by the payment of $4000. She appealed to the District
Court.

The District Court reversed the decree of the County Court,
and decided that the homestead exemption in the constitution, had
reference to the value of the lots, without including the im-
provements; and decreed and set apart to her and her children,
as a homestead, the said two improved eastern lots, leaving them

subject to the prior lien, if it was not discharged by the sale of the other lot. From this decree William H. Williams, adm'r of the estate of S. M. Williams, dec'd, B. A. Shepherd, and others, creditors of the estate of Henry Jenkins, dec'd, appealed.

*L. A. Thompson*, for the appellants.—The question presented n this case is as to the proper interpretation of Sec. 22 of Art. 7 of the constitution of the State, entitled General Provisions, which relates to the homestead exemption provided in said section.

The section of the constitution alluded to provides, that "the homestead of a family, not to exceed two hundred acres of land, (not included in a town or a city,) or any town or city lots, in value not to exceed two thousand dollars, shall not be subject to forced sale for any debts hereafter contracted, nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, in such manner as the legislature may hereafter point out."

Although this court has heretofore said, that in determining and setting apart an urban homestead, the structures, or improvements, on the town or city lots are to be included in the estimation, as in the following cases: North v. Shearn, 15 Tex. R., 174, and Hancock v. Morgan, 17 Tex. R., 582; yet it is argued, that these rulings are to be regarded as mere *dicta*; the points ruled not being necessary to the determination of the cases, and therefore the question is still an open one. Thus regarded, I respectfully submit the following views upon it.

"It is not the words of the law," says the ancient Plowden, "but the internal sense of it that makes the law; the letter of the law is the body; the sense and reason of the law is the soul." (Eyston v. Studd, Plowd., 465.) And Lord Coke says, "Every statute ought to be expounded, not according to the letter, but according to the meaning; *qui hæret in litera, hæret in cortice*." (11 Rep., 73.) The intention of the convention in making this provision is to be determined by the fair and natural import of the terms employed, considered with reference to the subject-matter of the enactment.

The sentence or clause in question is certainly awkwardly

framed, yet it is by no means so obscure as to require at the hands of the court any effort to exhume an occult meaning or intention. That it was the intention to render a substantial benefit to every citizen, who is the head of a family, cannot be doubted; that it was to withdraw from commerce a certain portion of the property of such person for the benefit of the whole family, is conceded; but that it was intended to confer on the beneficiary a specific "home as an asylum, or refuge, which cannot be invaded, nor its tranquillity disturbed, and in which may be nurtured and cherished feelings of individual independence," &c.; or to arouse and foster in the breast of the citizen a local attachment for a particular place, or dwelling, is denied. There is more poetry than truth in the idea. The object of the convention seems to have been, not so much to preserve inviolate and intact the specific building, or tenement, occupied and used as a dwelling place, at all hazards and in sacrifice and utter disregard of the rights of others, as to protect the unfortunate debtor and his family, to a limited and reasonable extent, to the end that he might not be entirely stripped by grasping and merciless creditors, and his wife and children turned adrift, not only without a home, or a shelter, but without a provision to obtain one.

The subject-matter of the enactment, then, is a provision for a homestead for every family in the State, which should enjoy an immunity from forced sales, and which should be inalienable by the husband without the consent of the wife, manifested in some mode to be thereafter pointed out by the legislature.

The very term employed, "homestead," necessarily includes within its meaning the idea of a house for a residence, or a dwelling to protect the owner against the inclemencies of the weather; it includes both the dwelling-house and the ground on which it stands, and which is within its curtilage, so far as the same may be employed for the use of the family. So intimately are the two ideas intermixed, or blended, in the word homestead, (anciently homestall,) that they are incapable of division or separation. And such is the express ruling of this court upon the point. In Franklin v. Coffee, this court says,—"there must be a homestead over which the constitution may throw its shield, and not land merely,

upon which the owner may or may not put his cabin, mansion or improvements, and claim as a home. A homestead necessarily includes the idea of a house for residence, or mansion-house." (18 Tex. R., 413.) Thus we see the subject-matter which was in the mind of the convention, and upon which its legislative power was to act.

But of the people for whom the convention was providing, some resided in the country, and were engaged in agriculture, or other pursuits which may be carried on there advantageously, and which formed by far the largest class; and some, who, from the nature of their business, or pursuits, or choice, were aggregated together in towns or cities; and provision was to be made for all, for the political status, or condition, of each class was equal in the sight of the law-giver. Hence we find regulations expressly made applicable to both town and country.

The rural homestead, or that which is not included within the limits of any town or city, was not to exceed in quantity two hundred acres of land; and the urban homestead, or that situated within the boundaries of a town or city, might consist of one or more lots; but, as we contend, in neither case, was the homestead exemption to be of greater value than the sum of two thousand dollars.

It is claimed that with respect to the rural homestead, this court has already authoritatively spoken in the case of Franklin v. Coffee, before cited. But an examination of the report of that case will show, that although the learned chief justice, who delivered the opinion of the court, does observe, that upon the rural homestead there is no restriction as to the value, yet that it is a mere *obiter dictum*. The point in the case which was to be decided, and upon which it turned, was,—whether the party claiming the exemption had acquired a homestead in the property, or not; and the proof showed that he had neither resided upon the land claimed, nor was there a house provided for a residence, nor was he making any preparation evidencing the intention to make it his homestead. The "judicial mind" was not specifically directed to the value of the exemption claimed; it was not discussed by counsel in the

argument, and was not necessary to be decided in order to dispose of the case.

The great disparity which is universally found in the value of the tenement, or building, provided by different persons for a residence, seems, of itself, to forbid the idea that the specific property so used should be protected irrespective of value. One man, deeming himself rich, and perhaps, at the time in fact so, may provide for himself and family a splendid residence worth, or costing, many thousand dollars; reverses of fortune may, in a short time, not only reduce him to poverty, but leave creditors to a large amount to be satisfied. Can it be supposed that the convention intended to protect this man to the extent of the large sums invested in his mansion, while his neighbor, who is equally entitled to the favor and protection of the laws, is confined to the sum of $2000 or less, merely because the tenement which the latter occupies is worth no more? Is it to be presumed, that the convention intended to guarantee to every head of a family, notwithstanding his ill conduct, or misfortune, a continuance of the luxuries, or comforts, which he had once gathered around him? Surely not. That the value in money was to regulate the homestead exemption seems to be clear; because it is necessary in order to place all the citizens upon an equal footing, as nearly as it can be done by a written rule. No rule could be framed which, perhaps, would obtain perfect equality; but such failure is incident to every written rule—indeed, I may say to every rule, whether of the written or the unwritten law; yet rules are not, for this reason, to be disregarded, but are to be observed; for if they do not attain perfection, they approximate thereto as nearly as can be done. Courts of justice will not intend that a constitutional convention, or any other legislative body, designed to discriminate between citizens, and to accord to some, as a class, greater rights or privileges than are extended to others. But whenever such special rights and privileges are asserted, if they can be sustained at all, the claim must be founded on plain and express enactment, for the reason that such discrimination is inconsistent with the genius and spirit of our form of government.

To estimate the *rural homestead* simply by the number of

acres of land within the maximum limit of two hundred acres, and the *urban homestead* by the value of the naked lot, or lots, disregarding, in each case, the value of the structures and improvements placed thereon; to reject all consideration of the subject matter upon which the convention was legislating, viz, *the homestead*—a term which includes the house as well as the ground on which it is erected—is to hold out a premium, reward, or inducement to men to waste their means, if not to exceed them; to disregard all prudence and economy, and to indulge in wasteful and unnecessary extravagance; and, in either case, to disappoint the just expectations of creditors, and even of the families which, it is said, it was the policy of the law to protect, by encouraging the investment of large sums in the erection of palatial residences. If such an interpretation was called for by the letter of the statute, it seems to me that a court of justice would, anxiously and diligently, scan and explore the statute for an intention which would control the letter of it; and would yield a reluctant obedience to the imperative demands of the *letter* of the law, only when by no fair and just interpretation it could be avoided.

But to return to the terms of the law. The *rural homestead* is to consist of not exceeding two hundred acres of land. Why was this peculiar phraseology used? why fix any number of acres as a maximum limit, unless it was to be regulated and controlled by some other rule or standard? Does it not conclusively show that it was in the mind of the convention, that while some homesteads of this class might contain the maximum number of acres, others, from some other causes or considerations, would, or ought to contain a less quantity? It is not assuming too much to say, that the convention knew, and considered, that which every one knows, that property of the same kind, or species, has a diversity of value; that some lands may be worth one sum per acre, and other lands a much larger sum; that there is, perhaps, as much diversity between the values of different parcels of lands, as there is between the wealth of different individuals. The values of lands, as well as all other species of property, must be proved in courts, whenever the value comes to be material to the issue. Did the convention intend that the two hundred acres, if the family

owned that quantity, should be allowed as a homestead exemption, whether the land was intrinsically worth one dollar per acre, or fifty dollars per acre? whether, if the land be intrinsically worth but little, its value had been enhanced by costly and expensive structures, as a manufactory for instance, as well as a dwelling house? or, on the other hand, if the value had been increased but a very little in consequence of the meanness, or rudeness of the improvements? Clearly not, or the provision would have been specifically for two hundred acres. By fixing two hundred acres as a maximum which is not to be exceeded, it is most clearly shown that there is some other rule or standard by which the judicial discretion of the tribunals of the country is to be guided and governed in the ascertainment of the exemption. And where is that rule or standard to be sought for? Shall it be said that we are to look outside of the law, and to understand that it means if the head of the family owns that quantity in the tract or parcel of land upon which he resides, or more? Or, is not the other rule, or standard, to be sought for in the law itself? That the latter is the proper course is too clear for argument. Then, resorting to the clause under consideration, there is found another limitation by which the discretion as to quantity is to be regulated and controlled—the homestead exemption is not to exceed the value of two thousand dollars. Applying the rule and standard furnished by this limitation of value, the result is, that just in proportion as the maximum quantity of two hundred acres of land, in any particular case, exceeds the limitation of two thousand dollars in value, whether from the intrinsic value of the soil, or from the improvements thereon, or any other adventitious circumstance, or from all combined, so the quantity as to acres of land will be reduced in number, until the homestead conform to, and agrees with, the maximum value. The whole clause forms but one sentence; and no other interpretation can be attained as to the rural homestead, save by rejecting entirely that member of the sentence which fixes and establishes the limitation of value; a course which may not be justified upon any rule of interpretation. And besides, the interpretation here given avoids the objection which would otherwise exist, of an unjust and invidious discrimination

and distinction between the two classes of homesteads—between citizens of the town and the country.

And so with respect to the *urban homestead;* while there is no restriction with respect to the number of those small divisions, or subdivisions, termed *lots,* into which a town or city tract is usually divided, there is the same limitation of value—the homestead in no case shall exceed the value of the two thousand dollars fixed as the standard. But it is argued very gravely and seriously, that it is to the value of the naked lot, or lots, stripped of all improvement, and regarded only as they stood in a natural state to which the limit of value is affixed. Can this be so? The subject matter is the same; for whether in the town or in the country, the homestead is the subject matter of enactment. It is the homestead which is to be protected from forced sale—which is to be inalienable by a husband without the consent of the wife. This term, as has been already shown, comprises and combines the mansion-house and the ground on which it stands. And although the terms "lands" and "lots" are used in the statute in close connection with the limitation as to value, yet nothing can be, or is, intended but the *homestead.* We may, with confidence, appeal to the time-honored legal maxim, *Cujus est solum, ejus est usque ad cælum;* which has given to the term *land* an extension bringing within its scope everything which exists naturally, or has been fixed artificially, between the centre of the earth and the confines of the atmosphere. A conveyance of *the land* passes to the grantee everything—the woods, waters and houses, as well as the fields, meadows, and all mines of metals, fossils, &c., beneath the surface, &c. There is no word of more general and extensive import. And the term "*lot*" is but another name to express and designate a small parcel of land situate within the limits of a town or city. Webster in his dictionary, giving the various definitions of the word *lot,* says: "6. In the United States, a piece or division of land; perhaps originally assigned by drawing *lots,* but now any portion, piece, or division. So we say, a man has a lot of land in Broadway, or in the meadow; he has a *lot* in the plain, or on the mountain; he has a home-*lot,* a house-*lot,* a wood-*lot.*" The term "lot" which is used in the constitution, is used synony-

mously with the term *land*, and is therefore equally as effectual to carry with it whatever will pass by the term *land*. And especially is this so when there is nothing in the enactment which tends to show that in using the terms *lands* and lots, the convention intended to be understood as separating the soil from the buildings, structures and improvements thereon.

But it is not of much moment what are the terms employed, or their precise signification; they must always be understood with reference to the subject-matter of the law. *Dwarris*, in his Treatise on Statutes, at p. 481, says: "In construing the words of an act of parliament, and collecting from them the intentions of the legislature, the *terms* are always to be understood as having a regard to the subject-matter; for that, it is to be remembered, will always be in the eye of the framer of the law, and all his expressions be directed to that end." And I ask the court to refer to the illustrations which the author gives of the application of the rule to various British statutes. To mention one as an example. The word "maintenance" is a term, he says, which is, in itself, and abstractedly, equivocal, but as it is used in the stat. West. I. c. 25, and Westm. II. c. 43, which are directed against the encouragement of litigation, its meaning is easily and readily perceived.

Applying the rule to the section of the constitution under consideration, the terms "acres of land," and "any town or city lot or lots," we readily perceive what was to be understood by those terms. The subject-matter of the enactment was the homestead; the design and object of the legislator was to ascertain and declare its extent; to furnish the rules by which it was to be measured, and to declare how it should be protected; the terms used, then, can only refer to the homestead. The simple land, or lots, which the head of a family might own, were not the objects which were in the mind of the convention, and with regard to which it was legislating; it was not the naked soil over which it was spreading the ægis of the constitution. These do not serve the purpose of a dwelling place, or afford shelter and protection to the wife and children. When, therefore, the convention was providing for a home and a refuge for the family, but felt constrained by a sense

of justice, and a due regard for the rights of others, to restrict and confine the exemption within reasonable bounds and limits, that body cannot be charged with the folly and absurdity of providing a standard to measure, not the dwelling-house, the home or the refuge, but the ground on which it stands, considered as land, or lots which are unimproved, wild, and in a state of nature. No other conclusion can be attained, then, but that the valuation of two thousand dollars is to be understood with regard to that which was in the eye of the legislator, and to which all his expressions were directed—the subject-matter of the law, the homestead. And like the *rural*, the *urban* homestead must be appraised and estimated, not only with respect to the intrinsic value of the lots, but also with regard to the character and extent of the improvements, and other accessorial circumstances; and as located, situated and improved by the erection of buildings, etc., if the value exceed the maximum limit of two thousand dollars, the excess belongs to the general estate of the party, and is liable for his debts.

With respect to the argument *ab inconvenienti*, which has been, or may be urged, it is only necessary to remark, that if the law is clear, and leads to no results which are actually absurd, inconveniences afford no argument of weight with the judge; the legislature only can remedy them. *Dwarris*, at p. 594, lays down the rule thus: "When the meaning of a statute is doubtful, the consequences may be considered in the construction; but where the meaning is plain, no consequences are to be regarded in the interpretation, for this would be assuming a legislative authority." (Citing 10 Mod. R., 344.) And we may well say here, that the language of the constitution being clear, and affording a suitable exemption, although it might not be, in the opinion of the court, adequate or sufficient, the obvious meaning and import of the terms of the law should govern; and its operation should not be extended upon a supposition, arising from extrinsic matters, that the exemption was intended to be more effectual or more extensive. If the view here taken of the intention of the legislator, as collected from the words of the law, is the correct one, then it is obvious that the supposed inconveniences and inade-

quacy do not in reality exist, but are mere creatures of the imagination, founded upon a mistaken and erroneous idea of the policy which dictated the provision, as well as of the character and extent of the exemption allowed.

Reference has been made to the debates in the convention to sustain this erroneous view of the intention of the law; but these can not be resorted to as furnishing a legitimate rule of interpretation. (See Sedgw. on Stats., 489; Eakin v. Rawle, 12 Sergt. & R., 352.) Hence it has not been deemed necessary to explore this source, and to examine and to discuss to what extent it supports the argument on that side of the question.

*Ballinger & Jack*, for appellees.—In none of the decisions heretofore made by this court, has the question now in issue been involved; and, therefore, there has been no direct "application of the judicial mind" to that question (Carroll v. Carroll, 16 How., 286–7); and upon a subject of such extensive importance, and of such deep interest, especially to the people of the larger towns of the State, we feel ourselves at liberty to give our views fully and freely, without being restrained by the chance expressions dropped by the court in the discussion of other points growing out of the homestead law.

In the first place, what is the critical, philological construction to be given to this provision of the constitution? In the next place, what should be the construction, looking to the main object and controlling policy of the law, and to the consequences which will result from the rule to be established? Both of these enquiries, we think, will fully sustain the judgment of the District Court.

I. Bouvier defines "homestead," "the *place* of the house or home-place;" Burrill, "the *place* of a home or house. That part of a man's *landed property* which is about and contiguous to his dwelling-house." Webster, "the *place* of a mansion-house; the *inclosure* or *ground* immediately connected with the mansion." So this court has held that, to constitute a homestead, it is not necessary that a house should be built or improvements made, if there are such preparations to improve as manifest, beyond doubt,

19Y

the intention to complete the improvements and reside upon the place as a home. (Franklin v. Coffee, 18 Tex., 417.) It is not, then, properly the home, the mansion-house, the improvements; it is the place, the ground, the enclosure they occupy, or are intended to occupy. We would not deny that the term "homestead" might well be held to embrace improvements, if used in that sense, if the context demonstrated such to be the intention of the parties, or of the law. But, so far from involving any necessary implication of the improvements, the strict meaning is otherwise. Taken in connection with the context in this section, the intention to confine it to the *ground alone* is clear. "The *homestead* of a family not to exceed two hundred acres of *land.*" Can language render more obvious that only the *land* of the homestead is referred to? "Or any town or city lot or lots in value not to exceed two thousand dollars." Here, also, admitting that the homestead may include lots, and include improvements, its use is *quoad* the lot or lots; definitive and regulative, specifically, of the lot or lots—without reference, allusion, or the remotest bearing as to the improvements. Admit the homestead to be a general term, including a number of particulars; the only particular limited is the value alone of the lots.

Let us come still more closely to the matter. What is the term in this sentence to which the limitation, "in value not to exceed two thousand dollars," is applicable? Is it to the homestead? Clearly not. The sentence is not equivalent to the homestead of a family in value not to exceed, etc. If the value related back to the word homestead, then the limitation would also be upon the two hundred acres of land, which the word homestead precedes. And this court has held this not the true construction. (Franklin v. Coffee, 18 Tex.)

The limitation of value is upon the "lot or lots." It is "any town or city lot or lots in value not to exceed two thousand dollars." True, they are the homestead lots; but not the homestead itself, in the general; not the entire homestead; not anything else which might be embraced in the homestead, except the lots.

The homestead exemption is of two hundred acres of land in the country—a bountiful provision for any and every part of the

State, and for every class of family. But a specific, arbitrary assignment of metes and limits to homesteads in towns and cities was impossible. The quantity which would have been very confined in a small town, or in the suburbs of a larger town, would exceed all usual or proper limits in the thickly settled and valuable parts of larger towns or cities. The only manner then in which the area of the homestead lots could be defined, was by affixing a maximum value estimated to be adequate to obtain sufficient lot or lots in any town or city for the establishment of the homestead, looking to the growth of towns and cities in other States, and to be anticipated in our own State.

But it is argued that improvements are part of the lots, and must necessarily be concluded in computing the value of the lots. That it cannot be said that a lot is of the value of $1000, if it has on it a house worth $2000. Is this a correct exposition of the meaning of the constitution? Land, it is true, in its most enlarged and technical sense, includes whatever is upon it, beneath it and above it. (1 Coke's Inst., 4; 2 Black. Com., 17, 18.) Does the constitution speak in this broadest and merely technical sense? Unless terms are merely employed in an evidently technical sense, the well received rule is that they are to be construed in statutes, and especially in a constitution, in their ordinary and common acceptation. It is plain that the constitution does not employ a technical term, nor use it in a technical sense. "Any town or city lot or lots." Do not these terms strike the mind as dissociated from the idea of improvements on them? Suppose the inquiry made as to the value of lots in Houston or Galveston, does it not suggest the naked lots? Suppose you are asked the value of lots on the Strand, in Galveston; would any man include in his answer an estimate of the buildings, or would he not separate, at once, in his mind between the ground and the improvements thereon? Would not his reply be, for example, that in the block occupied by Jones, Root & Co., lots are worth, say $500 each; although it might be that every lot in that block should have on it a building of double that value? Would he not say that the corner lot on Tremont street was the most valuable of that same block, although it might have on it an old

Williams v. Jenkins.

wooden building, and all the others be covered by elegant and costly stores? We appeal to the every day experience of the members of the court on this subject; and we aver that the terms lot or lots, value of town lots or city lots, by common and general usage, refer expressly to the ground as disconnected from the improvements.

Not only so, but the terms "town lots" already had their place on our statute book, *in pari materia*, distinguished from the improvements thereon. The act of January 6, 1839, (Hart. D., Art. 1270,) exempted from execution fifty acres of land, or one town lot, including the homestead and improvements, not exceeding $500 in value. This has been held by this court to have exempted the town lot absolutely, and homestead improvements to the value of $500. (Wood v. Wheeler, 6 Tex., 23.) When, then, the constitution employs the terms "town or city lot or lots," and puts the value upon them, it would seem clear that it did not include improvements in estimating the value, but that the change was the result of express design, and of a supposed better policy. The change made by the constitution from the law of 1839, place this matter, we think, beyond doubt. It greatly enlarged the exemption. Instead of fifty acres of land in the country, to two hundred; and instead of improvements thereon of $500, they are without limit. As respects towns, the first motion in the convention was to exempt "a town lot not to exceed $200 in value." Mr. McGowan suggested that there was no town lot in a town of any consequence which would not be worth more than $300." (p. 418.) It would seem palpable that improvements could not have been included in this valuation, and that they thus started out with a limitation upon the lot alone. As the subject was discussed, the policy of a liberal homestead exemption became more manifest and triumphant. All the propositions to fix a limitation to the value of the property exempted in this 22d section were rejected. $6000 was rejected. The policy of saying thus far you may improve, and no farther, was strongly repudiated. As to homesteads in towns and cities, the result was the removal of the limitation of value upon the improvements contained in the law of 1839; and the designation

of a value believed to be sufficient to procure the land, the ground, the lot or lots, in any town or city, for any reasonable family homestead, without any intention to limit the improvements thereon.

The correct analysis of this sentence, we think, obviously this : The main object, the leading idea is, that "the homestead of a family * * shall not be subject to forced sale," etc. But reasonable limits to the land or lots, for the establishment of a homestead, were deemed proper, and the intermediate parts of the sentence define and describe them, viz : "two hundred acres of land in the country : any town or city lot or lots in value not to exceed $2000." A limitation upon the number, extent, style or value of the improvements is not, in either case, within the purview of the constitution.

II. Our conviction is, without a single doubt, that this is the only construction which will give effect to the object and policy of the law; which will not lead to consequences subversive, in a great degree, of a homestead exemption, and the protection of families ; and which will maintain that equal and just regard to all the citizens of the State, which must be supposed to enter into the fundamental law of the land.

It cannot be denied that the leading object of the constitution is to exempt the homestead from sale under legal process, or without the wife's consent. *Cui bono ?* For what motives and objects? They are such as must be apparent to the reflection of every one, and are to be found in the Debates of the Convention on that subject. It was mainly to secure the homestead to the family against the vices or the misfortunes of the husband. Into whatever errors, recklessness or dissipation might lead him ; to whatever reverses the casualties of business might reduce him, the homestead of his wife and children might be secured to them beyond the reach of his creditors, and beyond his own improvident disposition. It was not an exemption of property merely of a certain amount or value. The first clause of the same section of the constitution gives "the legislature power to protect, by law, from forced sale, a certain portion of the property of all heads of families." The constitution did not repeal or interfere with the pro-

perty exemption already existing by statute; and it left that subject open to the entire discretion of the legislature. But it proceeds : " The homestead of a family  *  *  shall not be subject to forced sale," &c. It was emphatically for the benefit of the family. Not that a homestead was, under certain circumstances, to be provided for them; but the homestead of a family—their homestead, in effect, should remain theirs—should be preserved to them.

The inquiry presses itself upon us—What class of families were mainly intended to receive the protection of this clause of the constitution? Was it alone those whose entire homesteads had never reached the value of $2,000? Was this the class in whom the great evils had been witnessed which led to this law? True, their homesteads were made sacred to them forever. But we believe they were not the class whose exposure to misfortune had most deeply impressed the judgments and feelings of the framers of the constitution. It was, we submit to the court, those who had known better days, who had enjoyed competency or even affluence, but from the evil courses into which the husband fell, or from reverses caused by credit and speculation, had been rendered penniless and homeless. It was by this class, always a large one in a new, stirring and enterprising country, exposed to the fluctuations and hazards of trade, yet aiding in the development of a country, a class with many representatives in that very body, that their sympathies had been most strongly excited. And this provision in the constitution was certainly in part, if not in the main, intended to exert a wholesome influence upon them; to limit credit, to check restlessness and rashness, to build up a home influence, to give influence to the counsels of the wife, and to throw its protection around the family.

What are the terms in which the constitution preserves the homestead to the family? As respects the country, they admit of no debate. Two hundred acres of land are included, absolutely, without regard to its value, embracing all the improvements thereon, without regard to their number, character or value. The residence may be a palace; the improvements all that taste can suggest and art supply. This is a most munificent provision. It

is not only a shelter—an abode; it not only secures the soil of the roof-tree, but it gives to a family the means of support and competence. Any family with industry and economy, on two hundred acres of land, have certain means of subsistence and comfort, and even of retrieving themselves from debt. We do not speak from accurate sources; but have little doubt that this exemption is of a larger quantity of land than is owned by nineteen-twentieths of the farmers of the New England States, New York, or Pennsylvania. Two hundred acres was deemed the maximum liberal allowance for a country homestead. No family so large, or once so affluent, but every thing necessary to constitute the homestead—every thing which could enter into their associations and convenience as part of the homestead, will be embraced.

Let us now consider the exemption in a town or city. It could not be made of specific metes or area. Towns differ widely in the size of lots.; and lots may differ no less in the same town, owing to the views with which they are laid off. Take Galveston, for example, and look at its plan. On that part of it expected to be used eventually for business purposes, the lots are of four different dimensions. Go into the remoter parts and they are of two and a half to ten acres in size. Look too at the matter practically. The principal streets and most valuable business parts of a city will always be occupied by commercial houses of the larger class. Then will come the tradesman of small capital, occupying his single lot both for business and a residence. Then will come residences of business men, occupying no more ground than the residence covers, because ground is too valuable to be used otherwise. As you increase the distance, ground becomes less valuable and more is embraced, until you get where gardens are made and pastures enclosed; and until town and country blend together by scarce perceptible gradations. The provision for a homestead in our constitution was framed with a view to this universal, necessary condition of things in all towns and cities. It was impossible to have fixed an area for the homestead so as to have effected the practical and wise object in view, viz: to give the amount of ground proper or necessary to a homestead in the various parts of a city. The only means, therefore, to define the amount of

ground to be occupied by the homestead, was to fix a maximum value deemed a sufficient estimate for the ground of the homestead, according to the manner in which homesteads were necessary and customary in towns and cities, looking to their growth elsewhere, and to be anticipated in Texas. To the smaller tradesman occupying his place of business and residence together, even a part of a lot is sufficient, and $2,000 was supposed a liberal estimate for the ground, and when it rose above that, the course of business would drive him further back. Our observation and inquiry satisfy us that this was a very accurate adjustment ; and it will be found that with very great jugdment and forecast, a maximum value has been assigned to the lot or lots which will just about enable any class of family to provide themselves with the necessary ground for a homestead in towns and cities. And this it was intended to secure to the family ; to require the wife's consent to its alienation; to disable the husband from obtaining credit upon it; to preserve it from forced sale; and to make it in fact, and in law, the homestead of the family. We urge the court to give to this subject their practical observation and reflection. And they cannot fail to recognize the beneficent design in the constitution to secure to every family their homestead, the convenient, necessary ground or place for their habitation, against those disasters of life which would strip them away, caused by the husband's vices or misfortunes. Nor can they fail to be impressed more and more with the judgment, the providence, and the wisdom of the limitation of value adopted in the constitution.

The constitution of Texas shows how deeply were felt the evils and dangers arising from speculation, extravagance and debt. No State in the Union by its organic law has adopted such precautions against the expansions of credit. Banks are prohibited, and State indebtedness strictly guarded. The homestead exemption was part of the same plan, as is manifest from the arguments of its advocates in the convention. It was intended to take the homestead out of commerce, that it should not be a basis of credit.

At the same time, the principles of the constitution are most enlarged and liberal towards remedying the evils of the credit sys-

tem, and affording that protection to families which is in accordance with the humane and enlightened sentiments of the age. The constitution was framed by the light of the experience of the development and growth of other parts of our Confederacy. It was the frame-work of polity for a people then in their infancy, just delivered, we may say, from their revolutionary probation; but with boundless elements of development and wealth. Its makers had an eye to the onward career which has marked our State from that day to this, and to that far more prosperous future which we trust is before her. Its provisions were adapted not merely to the cheap lands, the straggling inhabitants and the small towns then in her borders, but to a country well populated, her lands well cultivated and valuable, her people busy with industry and enterprise, her cities marts of manufactures and commerce. For Texas, not alone as she was, nor as she is, but as in the providence of God she will be, the constitution has secured to every rural family, so fortunate as to possess it, against sale by law or without the wife's consent, their homestead of two hundred acres of land, regardless of the style or value of the improvements—not regardless either, but desiring and encouraging rather, as a benign and kindly mother, that they should afford support and comfort, and gratify the taste of the family. In the convention, upon the proposition to limit the value of the property exempted, Mr. Caldwell said :

" It would have the effect of preventing an individual from improving his land, for fear of increasing its value beyond the amount specified, and thereby deprive himself of a home altogether." (p. 420.) Mr. Rusk said, " We ought to place them (homesteads) beyond the reach of any contingencies arising from misfortune or mismanagement. * * * * * It will encourage a family in improving its homestead, when it is placed in such a condition that the husband cannot dispose of it without the consent of his wife."

And how as to towns and cities? Is the principle of the exemption here radically different? The country exemption fixes alone the quantity of land for the homestead, and makes it absolute. Does not the city exemption do precisely the same, reaching

the quantity of ground by the only practicable or sensible method, viz: by defining its value? The country homestead is two hundred acres of land, which may even now be worth $50 an acre; and in a few years will have a general average value of $20, $50, $100 an acre. Shall there be deemed no analogy, no correspondency in the lot or lots for the homestead in towns or cities? The country homestead is protected wholly irrespective of the value of improvements. Shall it be held that the city homestead was regulated with a specific reference to improvements and limited by their value? That it was the intention of the constitution to make a positive exemption for the benefit of families in the country of all improvements, however valuable or costly; but that in a town or city the moment the improvements, generally the result of the industry and taste of the wife, and with a view to the comfort of the family, exceed, with the ground, the value of $2000, that moment the homestead passes beyond the protection intended for families in towns and cities, by the constitution? Most respectfully, but confidently and urgently, do we submit to the court, that a construction operating so unequally, partially and unjustly, between the families of the country and of towns, could only be justified by language of the most imperative import, by the clearest intention; and that no foundation for such a construction exists in the constitution.

If the construction prevails that the improvements limit the value of the city homestead, the consequence will be, that whilst the great object of the homestead exemption is effected in the country, and all families are protected, not only against creditors, but alienations without the wife's consent; in towns and cities, practically, the constitution becomes almost a dead letter. What merchant, lawyer, physician, builder, master-workman, or man of business of any kind, (having a family,) in any prosperous town, has not a homestead with its improvements exceeding in value $2000; or if he has not, does not feel that it is a duty he owes his wife and family, to obtain it as soon as his means will allow? And in performing this duty to his family, must he thereby deprive them of that reliance and protection which the constitution guarantees to the family? Must he say to his wife, "If in establishing

our homestead we graduate it under $2000, and always keep it beneath that value, then the law gives you an interest in it, of which I cannot deprive you without your consent, and which will be preserved to you against the mischances of fortune?" As the necessities of the family increase, as the evidences of her thrift and taste are developed, as property may appreciate in value, must she have the consciousness that whenever a value is given to the property beyond $2000, then it passes from under the shield of the constitution, her consent to its alienation is no longer necessary, it becomes a subject of commerce, is no further protected against her husband's improvidence, or the demands of his creditors; and the only interest of the family therein is a kind of equitable lien, (charitably invented by the courts, outside of the words of the constitution,) for $2000 in money, with which practically the husband will do as it pleases him? Can it be true, that it was deliberately designed by the framers of the constitution, that all the matrons of Texas should have that legal and moral property and interest in the home, against the will of the husband above the power of the law, which would encourage and kindle in their bosoms still more ardently all those home feelings and influences which wise and good men desired to foster, except the mothers whose chance it might be to reside in something above the humblest class of homesteads in the towns and cities of the State? Were they purposely made an exception? We appeal to the court to enter into the spirit of the homestead exemption embodied in the organic law of Texas, into the conception of its motives and objects; let its benevolent sentiments, its noble policy, sink into your hearts; contemplate the effects it was intended to exert for all time upon the family character, and in the protection of families, and then find in your judgment, if you can, a reason why such an exception, so unequal and odious in its discrimination, should be maintained. We believe none can be found; that no consideration, no policy can be imagined why, in exempting a homestead to families in towns and cities, the same spirit should not prevail; why analogies between kindred objects should not be maintained; and why, in accordance with the obvious philology of the sentence, and with all practical sense applied to the subject,

---
---

the constitution should not be held, as for the country homestead, so also for the town or city homestead, to have adopted the most judicious method to prescribe and limit the land, the "lot or lots" deemed a proper exemption therefor, and both, equally, without reference to the improvements thereon?

The great objection urged, is, that it would open the way to frauds against creditors. The same argument was used in the convention, and was scouted from it. Judge Lipscomb replied wisely, secure the homestead by law, and you remove the induce-ments to frauds. So, we say, let the wife feel that her home, oftenest the work of her own taste, where she has lived and reared her family, is secured to them against improvidence and adversity, and you inspire a feeling not only of stronger local attachment, but of self-reliance in her bosom, relieving her from that abject dependence on her husband which renders her often the instrument of his frauds. You impress upon her that if misfortunes overtake her husband, if evil habits degrade him, she has still more than ever her duties to perform. The law turns benignly to her. It throws around her its protection; it recognizes her rights; it relies upon her energies. It aids her

> "To exert
> Her hidden strength, and throw out into practice
> Virtues which shun the day, and lie conceal'd
> In the smooth seasons and the calms of life."

Home is impenetrable and sacred; she need not yield it to his importunities. All the powers of the law cannot enter it. Her sister in the country is allowed under similar circumstances, broad fields, from which her family may still derive support. She has not these; but with her home secure, her lot is cast in a numerous community always affording facilities to good and true women to maintain their families, to whatever depths the husband may de-scend. May it please your Honors, to construe for the women and children of the towns and cities of Texas, the constitution of the State in that just and benign spirit which dictated its provisions. It meant to demark the foundation for their homesteads. It meant to prescribe in a judicious, practicable and liberal manner, that portion of the mother earth on which they might be secure, and

build their habitations. It meant not to repress a laudable view to taste and comfort in our towns and cities; to build them up with less than $2000 houses; to discourage the improvement and embellishment of their family homesteads. It meant to enter into no miserable calculation with the family overtaken by misfortune into the value of the improvements of the homestead; if found to exceed a certain sum, to turn them with a drunken or reckless husband into the streets, there to chaffer and contend against the squandering of $2000 more, for its investment in an humbler roof; nor, at the death of the father, to have the homestead closed upon them, and this amount placed in the hands of an inexperienced mother, to go forth into the world, and undertake the task of providing another home. But it meant, having prescribed the reasonable limits of the homestead ground, to permit it to be erected according to the means and tastes of the family, and to consecrate it to the family; to give it permanence and stability; to encourage its improvement and embellishment; to increase within its precincts the prerogative of the mother; to enable her to be conservative in a still higher degree of her husband's fortunes, and to oblige him to consult her in those restless schemes of removal or speculation, involving their common destiny; and if misfortune comes to him, and disables him from their support during life, or if death comes to him, it meant to preserve the homestead inviolate to the wife and children, with all its means and resources of support and consolation. And the spirit of the constitution breathes to them, " God speed."

The idea that homesteads will be made a means of fraud upon creditors, is a mere chimera. One great object of the constitution, we have to repeat, and constantly to urge, was to take the homestead out of commerce; to prevent its affording a basis of credit. So it would be, that the more a man invested in his homestead, the more he would withdraw from his means of obtaining credit. As a general rule, homesteads are occupied suitable for the family, its numbers, its wants, its tastes. These the constitution intended to preserve to them. Credit cannot rightfully be given with reference to their value. If the husband then fails in business; if reverses overtake him; if his other property is swept from him,

do the rights of creditors then take existence, and rise superior to the rights of the family? We stand not merely on the letter of the constitution; we appeal to those just and enlightened principles of modern society, which have long since ceased to regard the body of the debtor as a pledge to the creditor; or that families may be made beggars and houseless. With our highest capacities, and with reverent spirit, we carry the appeal still up to that law, which has been said to proceed from the bosom of God; and we believe its dictates are, that home should still be the sanctuary of the family against invasion by creditors. Not a home of prodigality or ostentation; the constitution sufficiently regards that; nor yet a home whose apartments must be of the smallest number, of the plainest style, of the lowest cost; but such a home as in the exercise of a commendable prudence and taste, will, under ordinary circumstances, have become the family habitation. That failing debtors will make investments in costly houses, without other means of support, is an idle conjecture. All government is based on a reliance upon the ordinary motives of conduct, with a view to general results and the greatest good. That exceptional instances may occur of the family of an insolvent occupying a house larger and costlier, finished and surrounded with more of taste than are indispensable to their comfort, or than may be considered suitable to their actual condition, could never be received as a sufficient reason to depart from the great and noble policy adopted in the constitution, the motives for which have swelled our bosom, but which we have been able to present with so little justice. The constitution proceeds on the principle of restraining the evils, and effectually at least, the worst evil of credit; of strengthening the husband against fraud, and preserving the wife's hands from it, forever; of protecting the family, and even aiding them to react against the strokes of fortune. If a hypothesis is to be raised to prevent a failing debtor from fraudulently disposing of his means, do not place before him the necessity of giving up the homestead of his family, with the alternative of some humbler roof for them in a town, or of such an investment as may be legally made in a country homestead. Do not put the perilous choice upon him, "$2000 in a town homestead, the best two hundred

Williams v. Jenkins.

acres of land with the best improvements you can find in the country." This would be to create the incentive and the means of fraud. The exemption of the country homestead is on a far more liberal scale, at all events, as each prosperous year in our State will render the more obvious and striking.

The law has effected all it deemed salutary as a restraint upon city homesteads by protecting them only when built on a lot or lots not exceeding the value of $2000. Whenever the growth and commerce of our cities shall bring in their train the evils of extravagance and ostentation, the constitution will be found to provide no immunity for them. The splendid town residence, beyond comparison with its neighbors, is a mere castle in the air. It will never be built. Why should it be? What would the failing debtor or his family want with it? This is all visionary. But when the time and circumstances come that will cause splendid mansions to rise in our cities, $2000 in value will not afford their foundations. Do not, then, produce that state of things which will break down those female virtues designed for ennobling culture by the homestead exemption, which will exile the family from its lifelong associations, the husband from the business to which his life has been devoted, in order that he may provide for his family in a country homestead the comforts and security denied to them in the locality where alone, most probably, their fortunes might be retrieved.

III. Our further view of the proper interpretation of the homestead exemption law, (though this case does not require its discussion,) is, that the estimate should be placed upon the value of the lots at the time they first became the homestead. This enables all parties to understand their rights, and obviates all difficulties in the practical administration of the law. The wife can always know precisely, or approximately, the value of the lots at that time; and the improvements for the family can then be safely made. Creditors, if they wish to reach the homestead or extend credit with reference to it are put upon easy information. The homestead exemption is then definite and fixed, not subject to fluctuation or other circumstances over which the family may have no control.

In the case of James v. Thompson, 14 Tex., 467, the court say, "If the estate be not solvent, the assignment of the homestead is to be continuous," that is, although it may appreciate in value 100 per cent. in thirty days, creditors have no additional rights. The court has only to give the proper application to this evidently correct principle. It is not the assignment by the Probate Court, nor the insolvency of the estate, which creates the right of the family to the homestead exemption as against creditors. That right accrued when it first became their homestead, and thenceforward was continuous. The law then appropriated the homestead to the family. Their right became legal, definite and fixed. It ceased to be a subject of credit or of alienation without the wife's consent. Creditors could acquire no right or equity against it. It is the homestead of the family, and if it appreciates in value it is for the family. The constitution must have intended to ascertain the homestead exemption, and that it should then be determinate and absolute, not precarious and uncertain. The homestead once established within the constitutional limits, it comes within the constitutional exemptions; the right of the family attaches, and is necessarily continuous. Constitutions lay down the landmarks, the general principles of the policy of a State. They do not enter into details. Generally the legislature does the latter, so as to meet all the features of any given case, and provide for the practical administration of the law by the courts. Where this has not been done by the legislature, courts will always give effect to the leading policy and main objects manifest in the constitution. To make the rights of a family, and introduce rights of creditors, dependent on subsequent fluctuations in the value of the lots, would not only be highly mischievous, but would occasion great and constant difficulty in the administration of the law.

We believe no question of higher public policy has ever come before this court; and our solicitude for the result is relieved by our confidence in the soundness of the views we have submitted to its consideration.

ROBERTS, J.—The constitution provides that "the legislature

Williams v. Jenkins.

shall have power to protect, by law, from forced sale a certain portion of the property of all heads of families. The homestead of a family, not to exceed two hundred acres of land, (not included in a town or city,) or town or city lot or lots, in value not to exceed two thousand dollars, shall not be subject to forced sale for any debts hereafter contracted, nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, in such manner as the legislature may hereafter point out." (Sec. 22, Art. 7, Con. of State. O. & W. Dig., 24.)

By the act concerning the estates of deceased persons it is provided that "at the first term of the court after an inventory and list of claims have been returned, it shall be the duty of the chief justice to set apart for the use and benefit of the widow and children, if there be either or any, of the deceased, all such property as may be exempted from execution or forced sale by the constitution or laws of the State, with the exception of any exemption of one year's supply of provisions; and in case there should be among the effects of the deceased all or any of the specific articles so exempted it shall be the duty of the chief justice to make an allowance in lieu thereof to the widow and children, or such of them as there be, which allowance shall be paid by the executor or administrator, either in money out of the first funds of the estate that may come to his hand, or in any property of the deceased that such widow or children may choose to take at the appraisement, or a part thereof in both, as they may select," &c. (Part of Art. 753, O. & W. Dig., 177.)

The order made by the County Court under these provisions, for the benefit of the widow and children in this case, not having been complained of by the creditors of the estate, but being brought into the District Court upon appeal by the widow, the correctness of the order of the County Court is not called in question by appellants in this court, the creditors.

And, therefore, the question in the case is whether or not the District Court erred in making an allowance more favorable to the widow and children than that contained in the order of the County Court.

The decree of the District Court is based upon a construction

20Y

of the section of the constitution above quoted, which makes the words " lot or lots " relate to the land contained in them exclusive of the improvements on them in estimating the value of the homestead.

A majority of the court do not believe this is the correct construction.

The leading objects of this provision of the constitution are : first, to exempt certain property from forced sale; second, to fix a limit for the amount of the property exempted as a homestead, up to which it shall be exempt; and third, to protect the wife from its disposition without her consent.

In fixing the limit up to which the homestead shall and must be allowed, and which the legislature has no power to diminish, two distinct standards were adopted, one for the country and another for the towns and cities. The former was fixed by quantity in acres, and the latter by value in money, ($2000.)

There is no reference made to improvements in either case. In valuing a lot or lots that constitute a homestead, the improvements would naturally be understood to be included in the valuation, unless expressly excluded. The term lot, in common use, means a piece or parcel of land, and a conveyance of it would carry with it any improvements that might be erected upon it. We think there is nothing expressed, and nothing in the nature and objects of the provision to require a different meaning to be attached to the words " lot or lots " from that which they ordinarily and naturally bear in common use in reference to real estate.

Judgment of the District Court is reversed and appeal of the widow dismissed.

Reversed and dismissed.