WESTERN MORTG. & INV. CO., Limited, v. GANZER et al.

(Circuit Court of Appeals, Fifth Circuit. June 12, 1894.)

No. 231.

1. HOMESTEAD—ATTEMPT TO INCUMBER—SIMULATED SALE TO RAISE VENDOR'S LIEN—NOTICE—PRINCIPAL AND AGENT.

Knowledge by the agent of a loan company that an ostensible sale and conveyance of a homestead is merely colorable, and for the purpose of enabling the owners to raise money thereon by discounting the notes for the deferred payments with the loan company on the faith and security of the resulting vendor's lien, is not imputable to the company itself when the whole transaction is arranged by collusion between the agent and the owners for the purpose of perpetrating a fraud upon the company; and in such case the company is entitled to rely upon the vendor's lien. McCormick, Circuit Judge, dissenting, on the ground that in the particular case there was no fraudulent intent, at least upon the part of the wife; that it was doubtful on the evidence whether the supposed agent was not acting for himself alone, as principal; and that, under such circumstances, it was opposed to the historical and constitutional policy of the state of Texas (in which the homestead was situated) to deprive the debtors of their homestead, even if they had intended to incumber it.

2. SAME—VENDOR'S LIEN—SUBROGATION.

It is the settled rule in Texas that, where one advances money to pay off a vendor's lien upon a homestead, and the money is so applied, the creditor becomes subrogated to the vendor's lien. Hicks v. Morris, 57 Tex. 658, and Pridgen v. Warn, 15 S. W. 559, 79 Tex. 588, followed.

Appeal from the Circuit Court of the United States for the Northern District of Texas.

The Western Mortgage & Investment Company, Limited, instituted this suit in the court below, praying for judgment against the appellee Ferdinand Ganzer on the latter's notes for $4,200, interest thereon, attorney's fees, and costs, and for foreclosure of deed of trust lien on certain lots in the city of Dallas, Tex., alleging that, on the written application of Ferdinand Ganzer, complainant had loaned him $4,200 on April 17, 1889, payable April 17, 1892, which loan .was secured by a trust deed executed and delivered by Ganzer and wife to J. B. Simpson, as trustee, at the time of the execution of the note. Complainant specially alleged and relied upon a subrogation clause in said trust deed, which recited the payment by complainant, at the express instance and request of grantors, of two vendor's lien notes on said lots, one for $1,200, and one for $1,000, not yet mature. The complainant made the other defendants parties to the suit as claimants under Ganzer. The appellees Ganzer and wife filed separate answers, substantially to the same effect,—that they had no knowledge of the character of the application made for the loan of $4,200; that it was prepared by complainant's agent, Simpson, and that it was signed by Ganzer, relying implicity upon Simpson's representations; that the lots in question were, at the time of the making of the deed of trust and said loan, a part of the homestead of defendants, and were so occupied for several years prior thereto, as was well known to complainant; consequently no lien attached. They pleaded in avoidance of the subrogation clause, subrogating to complainant the vendor's lien securing the $1,200 and $1,000 notes, that they were induced by the said Simpson, as the agent of complainant, to sell and execute their warranty deed to the premises in question, and deliver same to one John H. Eberhart, which falsely recited a consideration of $3,000 cash paid, and two vendor's lien notes of $1,200 and $1,000, which said vendor's lien notes were delivered by J. H. Eberhart to J. B. Simpson, who advanced to them (Ganzer and wife) only about $1,900 therefor; that, as between Simpson, Eberhart, and the Ganzers, the whole transaction was simulated to enable the Ganzers to borrow money on their homestead, and to enable the said Simpson and his son-in-law to realize handsome commissions thereby. Ferdinand Ganzer admitted his personal liability on the note, but on pleas of the fraud perpetrated by himself, his wife, and Simpson in the execution of a warranty deed, and execution and delivery of the notes recited, suggested that no lien existed against the lots in question, which were at the time and intended to remain a part of the Ganzer homestead. To the pleas of defendants, complainant answered with a replication, denying the allegations of defendants. The court below rendered a decree allowing complainant a personal judgment against Ferdinand Ganzer for $5,873.58, amount sued for, but denied the lien asserted by complainant, either as to the $4,200 note, or as to the $1,200 and $1,000 vendor's lien notes. Complainant excepted to the findings and conclusions of the court, and urged its motion for rehearing, which was overruled; and the appellant then appealed to this court.

W. M. Alexander, W. H. Clark, and W. L. Hall, for appellant.

Thomas & Turney and J. L. Harris, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). The assignments of error relied upon by the appellant present in different forms practically the same question; i. e. whether the court below erred in not allowing the plaintiff in error (appellant here) a lien on the lands in controversy for the amount of $2,200, represented by the vendor's lien notes, with interest thereon from April 17, 1891, for the reason that the complainant, at the express instance and request of the defendant Ganzer, and while innocent of any fraudulent taint affecting the notes, advanced the value thereof to pay the same before maturity, and became by contract expressly sub-

rogated to the lien securing the same. It is conceded that, notwithstanding the representations and declarations of the defendant Ganzer and his wife made in the application for a loan and in the recorded declaration of a homestead, the lots in controversy formed no part of Ganzer's homestead; yet the fact being established that said lots, at the time and up to the institution of this suit, were actually used as a homestead, renders the mortgage sought to be foreclosed in this case, so far as it grants a mortgage lien on the lots in controversy, not enforceable.

The evidence establishes that on the 16th day of November, 1888, the defendant Ferdinand Ganzer, having applied to J. B. Simpson, who was agent for the Scottish-American Mortgage Company, for a loan of money, offered as security the lots involved in this suit, which were then, and continued to be, a part of the homestead of said Ganzer and his wife, until the loan on which this suit was brought was made. Said Simpson suggested that, as the security formed part of the homestead of the Ganzers, the form of the security offered should be changed; that the Ganzers could convey the property to some trusted friend, who would give vendor's lien notes, and, after the loan was made, the property could be conveyed back. He further suggested that a plat of the homestead as an addition to the city of Dallas be made, evidently that a proper showing would appear of record. Ganzer and his wife, being fully informed of the purposes thereof, executed a conveyance of said lands to one John H. Eberhart, reciting a consideration of $5,200.—$3,000 cash, and two notes for deferred payments, one for $1,200, due at three years, and the other for $1,000, due at five years, with interest at 10 per cent. per annum, with vendor's lien retained. Said Eberhart made said notes, and at the same time made a trust deed to Simpson to secure the payment of the same. Simpson recorded both of said instruments, and, taking Ganzer's indorsement upon the alleged notes, discounted them for the Scottish-American Mortgage Company, and said company advanced the money therefor. Ganzer and his wife and Eberhart all knew, as well as Simpson, that the colorable sale to Eberhart was for the purpose of perpetrating a fraud upon the company discounting the notes, as well as upon the homestead law of the state of Texas; and in making said conveyance, and executing the deed of trust and the vendor's lien notes and the plat of Ganzer's addition to the city of Dallas, the said Ganzer and wife knowingly colluded with the agent of the Scottish-American Mortgage Company for the fraudulent purposes aforesaid.

In the case of Heidenheimer v. Stewart, 65 Tex. 323, it is said:

"The equities between the original parties to a mortgage cannot avail the mortgagor in a suit on the secured negotiable note to foreclose the mortgage (Jones Mortg. § 834; Hil. Mortg. 572), even if it results in the incumbrance of the homestead, if those entitled to the exemption have caused the result by their own deliberate fraud (Hurt v. Cooper, 63 Tex. 362). If the owners of the homestead simulate a transaction in which a negotiable note would be secured by a valid and meritorious lien on the exempt estate, and their artifice succeeds in imposing upon an innocent party, they are stopped from denying the truth of their solemn statements, and cannot be permitted

to prove that a lien their acts declared to be valid is void because their acts were false. The constitution prohibits liens on the homestead, except for purchase money or improvements. The lien asserted by appellant was for purchase money, if the transaction was genuine, and appellees are estopped, as against appellant, from proving that it was otherwise."

In the case of Cunningham v. Holcomb (Tex. Civ. App.) 21 S. W. 125, the court of civil appeals of Texas said:

"It seems to be held that where a third person conspires with an agent to perpetrate a fraud upon the principal, and the rights of innocent third par-' ties have not intervened, the principal is entitled to have a rescission of the contract made between his agent and such third party; or, if he elects not to have it rescinded, to have such other adequate relief as a court of equity may deem proper under the circumstances,"—citing Mecham, Ag. § 797.

In the case of Hurt v. Cooper, 63 Tex. 362, referred to in Heidenheimer v. Stewart, supra, which was a case where it was claimed that the sale and conveyance of a homestead was not real, but colorable, being resorted to as an expedient to raise money by negotiating the notes for the deferred payment, it was held that if the purchaser of the vendor's notes had notice that the conveyance was made to the apparent vendee by the owners of the homestead, not on a real consideration, but was accepted by him for their accommodation, and as a means of enabling the owners to procure money, then the deed to the apparent purchaser vested as to him no homestead rights of the original owners; but, if the purchaser had no such notice, he could rely upon the deed from those claiming the homestead as having been sufficient to divest them of all interest to the property; and this, even though the vendors had remained in possession of the property after executing the deed.

From these authorities, it is clear that the validity of the notes purporting to be for the purchase money in the sale from Ganzer to Eberhart, in the hands of the Scottish-American Mortgage Company, who discounted them for Ganzer, depends upon whether such company had notice of the colorable character of the transaction. The agent Simpson had full notice, in fact seems to have concocted the arrangement, and probably for the reason assigned by Ganzer, to wit, "on account of the large commissions allowed him by the company and other considerations of value to him;" but there is no pretense or suggestion that the Scottish-American Mortgage Company had actual notice. In this matter of notice the appellant contends, and the circuit court so held, that the general rule that a principal is bound by the knowledge of his agent is applicable to and controls this case.

The supreme court of the United States says:

"The general rule that a principal is bound by the knowledge of his agent is based upon the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty. When it is not the agent's duty to communicate such knowledge, when it would be unlawful for him to do so, as, for example, when it has been acquired confidentially as attorney for another client in a prior transaction, the reason of the rule ceases; and in such a case an agent would not be expected to do that which would involve the betrayal of professional confidence, and his principal ought not to be bound by his agent's secret and confidential information." Distilled Spirits Case, 11 Wall. 367.

In 1 Am. & Eng. Enc. Law, p. 423, we find:

"If an agent should collude with a third party to defraud the principal, the latter will not be responsible for knowledge of the agent in relation to such fraud. While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating."

From some of the cases cited in the Encyclopedia, supra, we quote as follows:

"The doctrine of constructive notice depends upon two considerations: First, that certain things existing in the relation or the conduct of parties, or in the case between them, beget a presumption so strong of actual knowledge that the law holds the knowledge to exist, because it is highly improbable it should not. * * * Bostock was acting as Mr. Kirby's solicitor in the transaction; and although, generally speaking, the knowledge obtained by a man's attorney or agent fixes himself, if obtained while so employed, and on the same business,—for I do not at all differ from Mountford v. Scott (a), Hiern v. Mill (b), and the other cases,—yet it cannot here be said that Mr. Kirby is fixed with all which Bostock knew; for the fraud practiced by Bostock upon Mr. Kirby himself was, of course, concealed from him; and so we may say would certainly be that other fraud which he had practiced on Mrs. Kennedy. Indeed, that was only another part of the same fraud,—another act of the same plot; and therefore I think we cannot, on this account alone, fix his client, Mr. Kirby, any more than his employer, Mrs. Kennedy, with the knowledge of his criminal proceedings. We must lay out of our view all the knowledge, the actual and full knowledge, he had of his own fraud, and are not to hold Mr. Kirby as cognizant (I mean, of course, cognizant in law and constructively) of that, merely because his solicitor himself—the contriver, the actor, and the gainer of the transaction—knew it all well." Kennedy v. Green, 10 Eng. Ch. 697, 718–724.

(a) 3 Madd. 34.       (b) 13 Ves. 114.

"A., to whom B. was indebted, advised C. to lend money to B., on the security of a mortgage of personal property, and acted as C.'s agent in completing the transaction. With the money thus obtained, B. paid A. the debt which he owed him. Both A. and B. acted in fraud of Gen. St. c. 118, §§ 89, 91; but C. had no knowledge of the fraud. Held, that the knowledge of A. was not in law imputable to C." Dillaway v. Butler. 135 Mass. 479.

"Where the same person is an officer of two corporations, and he transfers securities issued by one to the other, with knowledge that the securities are subject to an infirmity which renders them invalid in any hands but those of a bona fide holder for value, his knowledge is not the knowledge of the transferee." De Kay v. Water Co., 38 N. J. Eq. 158.

In the light of these authorities, and considering the fact, well established by the evidence, that Simpson and Ganzer and wife and Eberhart colluded in the execution of the alleged vendor's lien notes, we are constrained to hold that the knowledge of the agent Simpson as to the colorable character of the transaction cannot be imputed to the principal, the Scottish-American Mortgage Company, and the case is thus brought directly within the rule declared in Heidenheimer v. Stewart, supra, and Hurt v. Cooper, supra; and that the vendor's lien notes in the hands of the Scottish-American Mortgage Company should be treated as against Ganzer and wife as representing a valid, subsisting vendor's lien upon the property in controversy. This being the state of the case, the right of the complainant, the Western Mortgage & Investment Company, which

advanced the money to pay off and extinguish such vendor's lien under express subrogation thereto, must be recognized. If it be conceded that notice would affect the Western Mortgage & Investment Company, which is doubtful if the Scottish-American Mortgage Company was a holder of the vendor's lien notes without notice of their taint, then it is to be said that there is no more reason for charging the Western Mortgage & Investment Company with knowledge of the simulated sale by Ganzer to Eberhart, by reason of the knowledge of agent Simpson, than there is to charge the Scottish-American Mortgage Company.

We understand it is settled in Texas that, generally, where one advances money to pay off and discharge a vendor's lien upon a homestead, and the money is so applied, the creditor becomes subrogated to the vendor's lien so paid off and discharged. Hicks v. Morris, 57 Tex. 658; Pridgen v. Warn, 79 Tex. 588, 15 S. W. 559. In this case there was express subrogation by deed. For these reasons, we are compelled to disagree with the conclusions of the circuit court, and hold that it erred in refusing to recognize the complainant's lien for the amount of the alleged vendor's lien notes executed by Eberhart, acquired by the Scottish-American Mortgage Company, and paid off with the moneys obtained from the complainant.

The decree appealed from is reversed, and the cause is remanded, with instructions to enter a decree in favor of the Western Mortgage & Investment Company, Limited, for the amount of the vendor's lien notes, principal and interest, executed by J. H. Eberhart, and recognizing the same as a vendor's lien upon the property described in the complainant's bill, directing the foreclosure of such lien, and the sale of the property to pay the same.

(October 2, 1894.)

McCORMICK, Circuit Judge (dissenting). At the last term of this court, I had to dissent from the judgment and opinion of the court in a homestead case coming before us from Texas. I have now to again dissent from the judgment and opinion in this case, which is a homestead case coming to us from the same state. I dissent from the views expressed and implied in the statement of the case made by the court in the opening of the opinion, and emphasized as premises for the reasoning of the opinion. As I said in Ivory v. Kennedy, 6 C. C. A. 371, 57 Fed. 340, in this case there is no question of high equities before us, but a very plain matter of intensely Texas law. From the nature of the case, all homestead questions are local, and domestic to the state where the suit originates. In this case, as in every such case arising in Texas, the issues present mixed questions of law and fact. In considering these, perspective is of vital essence. Our view of the force and right application of the written law, of the credibility of the witnesses, and of the weight of the evidence will take its hue from the medium through which we look. The general principles of the law of evidence, of natural equity, of approved procedure, and the settled canons of construction are to be observed; but it is the Texas law, and not

another, that we are called to construe in this case, and from the standpoint and through the medium of that law we should look into the issues joined by these parties appellant and appellees. Whatever may be our individual views as to the concrete wisdom, justice, and force of hoary maxims, we may not struggle to render remedial organic laws nugatory, because such laws may appear to us to be in conflict with the principles embalmed in these time-honored maxims.

Judge Bynum said in Duvall v. Rollins, 71 N. C. 221:

"Our laws have long been so framed as to make fraudulent conveyances void as to creditors, and our habits of thinking run in the same direction; so that it is difficult to realize that another and a new right has been interposed between the creditor and debtor which secures certain of his property, even from his own frauds, upon creditors. It is confirmed by the constitution, and is inviolable."

Mr. Thompson, in his work on Homestead and Exemption Laws, says these laws "have never been supposed to be founded in principles of equity and justice, but are supported by reasons of humanity, expediency, and sound policy, and these reasons have secured for them on the part of courts a liberal interpretation." Section 339. They are not against equity and justice, but above these, as the substance of saving faith is not against reason, but above it. The genesis of these laws, the every-day life and thought of the people who live under them, the expression of the popular construction of them in the successive and progressive steps in organic and statutory legislation which mark the trend of the public policy of the state, the whole line of adjudged cases, the general voice of the legal profession in the state, the very air of the inns of court, and the utterances from the trial bench, furnish efficient helps to a sound construction and right, practical application of the provisions of the written constitution on this subject.

In construing a statute of Massachusetts on the subject of homestead exemption, Mr. Justice Gray, then chief justice of the supreme court of that state, declined to consider the cases in some of the western states cited by the learned counsel in the case of Searle v. Chafman further than to note that they were supported by no reasons, and did not disclose how far they may have been influenced by local statutes. 121 Mass. 19. In construing her statutes, the courts of Massachusetts did not need to look to some of the western states, or any of the new states, but naturally and wisely looked to the common law, and to the principles and practice of the settled jurisprudence in their own state. In the sense in which those terms are used by Judge Gray, Texas is not a "western state," nor is she, as to her history and jurisprudence, a "new state." San Antonio is as old as Philadelphia; and considered, in relation to homestead exemption laws, Texas is the senior state,—the pioneer. In this light, Virginia and Massachusetts are the new states. When the Anglo-American colonists were admitted into Texas, they found in force there a system of laws as ancient as the English common law, as rich in immemorial tradition, in ethical philosophy, and in fitness for the practical administration of substantial justice as the

common law of England, aided by the jurisdiction and practice in equity. It had not attained or retained that refinement in technical pleading which, with its much-lauded erudition, holds a dense mystic veil between the suitor and the shrine; nor did it denounce a penalty against poverty or insolvency. It recognized in the creditor and in the debtor alike, first of all and above all, his inferior properties, the husband and father, if he were such, and the citizen, whether or not he was husband or father. If he was a debtor, it exempted his person from seizure on that account, at the creditor's suit; and, in aid of this exemption and the discharge of his higher duties, it exempted from such seizure the farmer's implements and beasts of husbandry, the bread of bakers, tools of artificers, books of advocates and students, beds, wearing apparel, and other things necessary for daily use. Cobb v. Coleman, 14 Tex. 598. When these colonists had, by successful revolution, crowned themselves sovereign of the soil of Texas, they blended this system into which they had been admitted, and to which they had become attached, with that system of the common law and chancery of England into which most of them had been born and become more or less instructed, and formed that union of principles and procedure which the first judges of the Texas state supreme court were wont to regard and call "Our Peculiar System." Sovereign, independent Texas put in her first constitution, "No person shall be imprisoned for debt in consequence of inability to pay." Constitution adopted March 17, 1836. On the 26th January, 1839, she provided by statute:

"There shall be reserved to every citizen or head of a family in this republic, free and independent of the power of a writ of fieri facias or other execution issuing from any court of competent jurisdiction whatever, fifty acres of land, or one town lot, including his or her homestead and improvements, not exceeding five hundred dollars in value, all household and kitchen furniture (provided it does not exceed in value two hundred dollars), all implements of husbandry (provided they shall not exceed fifty dollars in value), all tools, apparatus and books belonging to the trade or profession of any citizen, five milch cows, one yoke of work oxen or one horse, twenty hogs and one year's provisions." 3 Gen. Laws Tex. p. 113.

By a statute which took effect February 25, 1843, it was provided that, on the death of a citizen, such of his property as had been exempted from execution should be set aside by the ordinary for the sole use and benefit of the widow and children of the deceased. 7 Gen. Laws, p. 12.

The first constitution of the state of Texas provided:

"The legislature shall have power to protect by law from forced sale, a certain portion of the property of all heads of families. The homestead of a family not to exceed two hundred acres of land (not included in a town or city) or any town or city lot or lots in value not to exceed two thousand dollars shall not be subject to forced sale, for any debts hereafter contracted; nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, in such manner as the legislature may hereafter point out." Const. 1845, art. 7, § 22.

The act of May 11, 1846, provided, in reference to the administration of the estates of deceased persons, that all exempt property should be set aside for the sole use and benefit of the widow and

children; and, in case there were not among the effects of the estate all or any of the specific articles which by the constitution and laws would have been exempt, they should be procured by a sale of other effects. 10 Gen. Laws, p. 308.

By the act of March 20, 1848, it was provided that the ordinary should make an allowance in money adequate for the support of the widow and children for one year, and that all exempt property, except a year's provision, should be set aside for their sole use and benefit; and, in case there were not all or any of such property belonging to the estate, an allowance in money in lieu thereof should be made; both of these allowances to be a charge on the assets of the estate superior to judgment or mortgage creditors. Hartley, Dig. arts. 1153, 1154; 11 Gen. Laws, p. 235.

The act of February, 1860, provided:

"The homestead in a town or city exempt from forced sale is hereby declared to be the lot or lots occupied or destined as a family residence, not to exceed in value two thousand dollars at the time of their destination as a homestead; nor shall the subsequent increase in the value of the homestead by reason of improvements or otherwise, subject the homestead to forced sale." Pasch. Dig. art. 3628; 17 Gen. Laws, pt. 1, p. 34.

The act of November 10, 1866, provided:

"There shall be reserved to every citizen, head of a family or householder being a citizen in this state, free and independent of the power of a writ of fieri facias, or other execution, issued from any court of competent jurisdiction whatever, two hundred acres of land, including his or her homestead (not included in a town or city), or any town or city lot or lots in value not to exceed two thousand dollars at the time of their designation as a homestead; nor shall the subsequent increase in the value of the homestead, by reason of improvements or otherwise, subject the same to forced sale; household and kitchen furniture not to exceed five hundred dollars in value; all implements of husbandry; all tools, apparatus and books belonging to any trade or profession; five milch cows; two yoke of work oxen and two horses; one wagon; twenty hogs; twenty head of sheep and one year's provision; all saddles, bridles and harness necessary for the use of the family. There shall in like manner be reserved to every citizen not a head of a family * * * one horse, bridle and saddle; all wearing apparel; all tools, books and apparatus belonging to his trade or profession." 20 Gen. Laws, p. 160.

The constitution of 1869 provided:

"The legislature shall have power and it shall be their duty to protect by law from forced sale, a certain portion of the property of all heads of families. The homestead of a family not to exceed two hundred acres of land (not included in a city, town or village) or any city, town or village lot or lots not to exceed five thousand dollars in value at the time of their destination as a homestead and without reference to the value of any improvements thereon shall not be subject to forced sale for debts, except they be for the purchase money thereof, for the taxes assessed thereon, or for labor and material expended thereon; nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, and in such manner as may be prescribed by law." Const. 1869, art. 12, § 15.

The constitution now in force provides:

"Sec. 49. The legislature shall have power, and it shall be its duty to protect by law from forced sale, a certain portion of the personal property of all heads of families, and also of unmarried adults male and female.

"Sec. 50. The homestead of a family shall be, and is hereby protected from forced sale for the payment of all debts, except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for

work and material used in constructing improvements thereon, and in this last case only when the work and material are contracted for in writing, with the consent of the wife given in the same manner as is required in making a sale and conveyance of the homestead; nor shall the owner, if a married man, sell the homestead without the consent of the wife given in such manner as may be prescribed by law. No mortgage, trust deed or other lien on the homestead shall ever be valid, except for the purchase money thereof or improvements thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien shall have been created by the husband alone or together with his wife; and all pretended sales of the homestead involving any condition of defeasance shall be void.

"Sec. 51. The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a town, city or village shall consist of lot or lots not to exceed in value five thousand dollars at the time of their designation as the homestead, without reference to the value of any improvements thereon; provided that the same shall be used for the purposes of a home, or. as a place to exercise the calling or business of the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired.

"Sec. 52. On the death of the husband or wife, or both, the homestead shall descend and vest in like manner as other real property of the deceased and shall be governed by the same laws of descent and distribution, but it shall not be partitioned among the heirs of the deceased during the life time of the surviving husband or wife, or so long as the survivor may elect to use or occupy the same as a homestead, or so long as the guardian of the minor children of the deceased may be permitted, under the order of the proper court having the jurisdiction, to use and occupy the same."

Const. 1876, art. 16, §§ 49–52.

Excepting the period from 1866 to 1876, the supreme court of the state of Texas has been composed of a chief justice and two associate justices. The first chief justice, Judge John Hemphill, had been reared and received a university training, including his preparation for the bar, in a common-law state. He had acquired an ample knowledge of the Spanish language and of the laws of Spain and Mexico. He was four years chief justice in the republic of Texas. He was a member of the convention that framed the constitution of 1845. He remained chief justice 13 years, at the expiration of which time he resigned, to accept the position of United States senator. Judge Abner S. Lipscomb, one of the first associate justices, had adorned the supreme bench of Alabama before he became a citizen of Texas. He, too, was a member of the convention that framed the constitution of 1845. He was a man of force in all the elements of manhood. He was a bold and sound thinker, whose gift and habit it was "to detect and watch that gleam of light which flashed across his mind from within, more than the luster of the firmament of sages." He continued on the bench till his death, which occurred in December, 1856. The other one of the first associate justices, Judge Royall T. Wheeler, was bred to the law in a common-law state. He was a man of profound learning and wisdom. He had a genius for judicial work. He was richly endowed with the virtues and graces which support and give a charm to high rank in public and in private life. He became chief justice on the retirement of Judge Hemphill. He continued on the bench till his death, in 1863. To fill the vacancy occasioned

by the death of Judge Lipscomb, Judge Oran M. Roberts was elected.   He had received a university training and had served in the legislature of a common-law state before becoming a citizen of Texas, after which he grew and ripened through a full general practice at the bar and service as attorney for the state and as nisi prius judge before his elevation to the supreme bench.   For more than 40 years he has done service to the state in places of the highest trust and honor, to the equal credit of the state and himself, and now, venerable and venerated, is enjoying in a green old age the respect and affectionate esteem of all worthy men who know him.    To fill the vacancy occasioned by the retirement of Judge Hemphill and the promotion of Judge Wheeler, a native Texan, Judge James H. Bell, was elected, of whom, as he was a near kinsman of mine, I may not further speak.   In 1861, Judge Roberts withdrew from the bench to take military service in the war then flagrant, and remained off till after the death of Chief Justice Wheeler.   To fill the vacancy thus caused, Judge George F. Moore was elected.   During his long service on that bench, he so impressed himself on and endeared himself to the legal profession and the people of Texas that when his sight had so far failed as to impede his wonted dispatch of work, and he expressed a wish, on that account, to retire, with one consent he was pressed to remain as long as his general health could support the labor of sitting in consultation with his brethren. Not to make further specific mention, it is safe and meet to say that, excluding the period of reconstruction when conditions were abnormal, the constituents of the supreme court of Texas have ever been men and lawyers of the first rank, worthy and fit to sit in any court, and faithful to their trust.

Running through 40 years, and through 80 volumes of its official reports, that court has published written opinions in 385 distinctly homestead cases.   Beginning with the earliest case, it has profoundly considered, and has often, and sometimes warmly, stated the object and purpose of, the homestead exemption; so much so that 10 years ago the court, speaking through the late chief justice (over whose death the state now mourns), then associate justice, said:

"The object and purpose of the homestead exemption has been so often stated that there is no need to repeat now."

And later, through the present chief justice, then associate justice, the court said:

"The beneficent provisions of our homestead laws have been the occasion of much enthusiastic comment and of not a few rhetorical flourishes in the opinions of this court."

In one of the later, if not the last, of the opinions delivered by Chief Justice Moore in a homestead case, this language occurs:

"Whether the policy of our legislation regarding the homestead exemption has been wise or unwise is not for us to say.   It is, however, unquestionable that from its first introduction there has been a uniform and steady tendency in the popular mind in favor of its liberalization and enlargement; and, if the courts have not at all times responded to the popular sentiment upon the subject, they have been constrained to give way to it by more explicit legis-

lation or constitutional enactments.   For example, no sooner was it mani-
fest that the courts were inclined to construe the exemption in the consti-
tution of 1845 as referable both to the lot and its improvements than it was
declared the improvements should not be considered in estimating the value
of the exempted lots; and, as we think, when it became apparent that this
court did not regard the place of business of the head of the family, if en-
tirely distinct and separate from their home, as within the exemption, by
reason of its use, there was an enlargement of the homestead exemption, as
we find it in the present constitution."   Miller v. Menke, 56 Tex. 550.

From a careful consideration of the whole line of Texas decisions
on this subject, it appears obvious to me that the provisions of the
constitution now in force in Texas are not, in substance, an en-
largement of the homestead exemption, but only a more explicit
expression of that exemption,—a conclusive organic construction by
the people of Texas of the exemption as fixed in the first constitu-
tion of the state government.    An exhaustive analysis of the respec-
tive constitutional provisions and review of the numerous decisions
would lead too far, but a few suggestions may be indulged, and
will suffice.    The first sentence of section 22, art. 7, in the constitu-
tion of 1845, as a mere grant of power, was unnecessary.    The
legislature had exercised that power, in the absence of such a grant,
by the act of 1839, the validity of which has never been questioned.
Subject to be withdrawn or modified by the constitution, it was in-
herent in the legislature.    The intent of this sentence, therefore,
must have been to charge the legislature with a duty.    The specific
and exhaustive provision in the next sentence left personal property
only on which the legislative power could act.    Both of these neces-
sary implications are now expressed in section 49, art. 16.    The self-
acting, exclusive character of the homestead provision in the second
sentence of section 22, so clearly implied therein, and authoritatively
announced by the supreme court in Darst v. Walker, 31 Tex. 681,
is literally expressed in the words "and is hereby," in section 50.
The exceptions embraced in this section are clearly constructions of
the existing exemption, for the law had and has ever been in Texas
that, to the extent of the unpaid purchase money, the vendor of land
retains the superior title.    The homestead exemption can only
attach or rest on what the claimant owns, be it fee simple, equity
of redemption, as tenant in common, leasehold, or other right.    The
homestead, therefore, had never been protected from forced sale
for the payment of the purchase money thereof.    Where the vendor's
lien covered more than the exempt homestead, it had, in case of
sale, to seek satisfaction first out of the excess.    It was never sup-
posed or held that the homestead was not liable for the taxes as-
sessed thereon.    The supreme court accept the last sentence of sec-
tion 50 "as a legislative construction of the general policy of our
state in this regard."    Black v. Rockmore, 50 Tex. 96.    It must
have been in Judge Moore's mind, when he wrote the language above
quoted from Miller v. Menke, that section 51 was, as touching the
particulars he was considering, rather a reversal of Williams v.
Jenkins, 25 Tex. 279, and of Iken v. Olenick, 42 Tex. 195, than an ex-
tension of the exemption.    Even the change in the numerical
figures used to express the limit of value put on the urban home-

stead is not, in fact, an enlargement of that exemption as fixed in the constitution of 1845. It is only a restoration of it. In 1845 the purchasing power of the precious metals had not been lowered by the output of the mines in Australia and in our Pacific states. The value of the bare land of the average rural homestead did not exceed, probably rarely equaled, $2,000. It is evident that the intention was, as it certainly should have been, to make equal provision, as nearly as could be, for each of the two classes of inhabitants into which all civilized people are divided,—the rural and the urban. In 1869 and in 1876 the conditions of the currency and of the country were so changed that, in order to preserve the spirit of the provision, it was necessary to change the letter. The spirit giveth life; the letter killeth. He that sticks in the letter stops in the bark, and fails to reach or know the rich sap and stout heart of this tree of life, of Texas origin, which for 50 years has cast forth its good seed into the fields of other states, where some have fallen by the wayside, and some on stony places, and some among thorns, but much other has been received into good ground, and brought forth fruit in due season and measure, while in its native soil the parent tree maintains perennial life and growth, majestic in its strength, a joy forever in its beauty. Its roots take deep hold on and fill all the land. Its trunk and limbs and leaves and bloom and fruit shelter, heal, delight, and nourish the families that uphold the pillars of the state. And whosoever will, let him come.

This policy of homestead exemption is not a provision by the public for the poor. It has no element of pauperism in it; neither has it any element of bounty in it. It does not collect from the provident and affluent, and bestow its exactions to foster fraud or sloth. It bestows on all alike. It takes from all alike. It takes from all heads of families the right to make so much of their land as they use as a home the basis of credit, and from the married man who owns a homestead the right to sell it, except with the consent of his wife, and in the manner prescribed by law. It is not the debtor who is protected from his creditor; it is the homestead of the family that is protected against both. As to the homestead, the owner is not and cannot become a debtor. The land is bound for the charges fixed on it before the homestead designation. These charges may be enforced. They are the debts of the homestead. They underlie its right, and are not ousted or rendered dormant by the homestead use. But no act of the owners or of others can put a charge over the homestead use not within the named exceptions. Homestead in Texas is not an estate that can be sold and conveyed, or a right that can be waived by deed, or estoppel arising out of recitations in a deed. Where, in fact, the property is actually in use for homestead purposes, neither the declarations of the husband or of the wife, nor of both, can change its character. Jacobs v. Hawkins, 63 Tex. 1. The husband and wife cannot by any character of solemn writing, executed and acknowledged, or even sworn to before a public officer, authorized to take acknowledgments of married women and of other parties, and to administer oaths generally, and placing that paper in the

custody of the register of deeds to land for the county, and having it inscribed in the order of its date on the book for the record of deeds, and accurately indexed, restrict the limits of their homestead defined by actual use. There is no law authorizing such a restriction, nor can the legislature of Texas so provide. Radford v. Lyon, 65 Tex. 471. The convention that framed the constitution now in force did, with great deliberation, after full and earnest debate, most wisely refuse to require or authorize the designation of the homestead to be made on the record. The act for subjecting the excess in a rural homestead to execution has no application to this case, even if all of its provisions are valid, which as yet has not been tested. The constitutional method of designation is "that the same shall be used for the purposes of a home or as a place to exercise the calling or business of the head of a family." The right of trial by jury remains inviolate. There are now in Texas, approximately, 2,500,000 people, which will give, allowing five persons to a family, 500,000 families. If one-half of these live in a city, town, or village, and own homesteads to the limit in value of the exemption, these homesteads will embrace improved real estate the bare ground of which was at the time of designation of the value of $1,250,000,000. If the other half of these families own homesteads not in a town or city, to the limit in area of the exemption, they will aggregate 78,125 square miles of improved country lands. It is sadly true that many families do not own their homes. Many others are not able to own to the extent of the exemption. It is happily true that very many who own homesteads have no desire to borrow money on them, and could not be tempted. The strictly legal possibilities only are given in the above figures, and, though far beyond the moral and practical possibilities, show the gravity of the subject; and the number and character of current suits, as shown by official records and reports, show the interest, the zeal, the cunning, and the skill which mortgage companies and other money lenders have, and have often successfully exerted, to evade this exemption, and reach with their investments the homes which it is the policy of the state to protect from their benevolence.

As already stated, the homestead in Texas has always been held to be subject to forced sale for the payment of the purchase money thereof, but not for the payment of the purchase money of five times as much more, or of any more, of a tract of which it formed a part in the purchase. In Harrison v. Oberthier, 40 Tex. 385, it appears that John Harrison had bought 307 acres of land from T. J. Walling. John Harrison died. His widow resided on the land. On the application of the administrator, 200 acres of the tract were set apart for her as homestead. There still remained due to Walling of the unpaid purchase money of the 307 acres about $600. He asked for and obtained an order of the county court for a sale of all the land for cash, to satisfy his unpaid purchase money. Oberthier was in possession of the land, as the tenant of the plaintiff (the widow), at the time the sale under the order of the probate court was made. He bought at the sale. It was confirmed. The administrator con-.

veyed the land to the purchaser on his payment of the purchase money, with which Walling's claim was paid. The widow brought trespass for the whole tract. The trial court gave judgment against her, and she appealed. In the supreme court the case was reversed, on a question of procedure. The purchaser at the probate sale was held to have acquired no title to the land by his purchase, but to have become subrogated to the right of Walling, by the payment to him of the purchase money. The court pointed out the correct procedure to have his rights enforced, and said:

"If this course should be taken, and it should be found necessary to sell the land to pay the balance of the purchase money, the surplus of one hundred and seven acres in excess of the homestead should be sold first, and the deficit, if any, should be made up by a sale of a sufficient quantity, or the whole, if necessary, of the two hundred acres, if it is not otherwise paid."

The case of Pridgen v. Warn, 79 Tex. 588, 15 S. W. 559, I have studied with care. To give an adequate analysis of it would involve irksome detail. I insist that it is not authority for the decision of the court in Ivory v. Kennedy. "All pretended sales of the homestead involving any condition of defeasance shall be void," and "no mortgage, trust deed, or other lien on the homestead shall ever be valid, * * * whether such mortgage or trust deed or other lien shall have been created by the husband alone or together with his wife,"—is the mandate of the constitution. Real sales of the homestead, made in the manner prescribed by law, will, like mortgages on the separate property of the wife to secure the debts of the husband, be closely scrutinized; and they must be free from symptoms of fraud, coercion, or undue influence, but within the conditions of good faith they are not discouraged. Where a fraud is practiced on the wife by others whom she trusted, and the purchaser is willfully blind, in order that he may profit by it, he is as guilty as those who perpetrated the fraud. If, before signing and acknowledging the deed, she was made to believe that these acts were a mere matter of form, and not binding on her or on her home, of which the creditor had knowledge or should have taken notice, the wife will not be bound. Shelby v. Burtis, 18 Tex. 645; Pierce v. Fort, 60 Tex. 464.

In the case of Hurt v. Cooper, 63 Tex. 362, it was claimed in the answers that the lots on which the trust deed was given by Cooper were conveyed by Catherine and Thomas D. Gilbert and his wife to Cooper for the sole purpose of procuring a note in the form of a purchase-money note, on which appellant was willing to lend money, and that in fact Cooper made the note and accepted the deed solely for the accommodation of the Gilberts, who, as between themselves and Cooper, were the real debtors and also the owners of the lots, which, in accordance with the original understanding between them, he soon afterwards reconveyed. The evidence showed that, as between the Gilberts and Cooper, such was the real nature of the transaction. The answer further alleged that Hurt had timely notice. The court says:

"If he had such notice, then he could not rely upon the deed from the Gilberts to Cooper for the divestiture of such homestead rights as the former had in lot 11, block 143, for he would stand charged with notice that Cooper

held the legal title to the lot in trust for the Gilberts; and the trust deed by him, apparently made to secure the purchase money for the lot, could not have any further effect towards the divestiture of the homestead right than would such a deed had it been executed by the Gilberts directly. If, however, Hurt had no notice of the nature or purpose of the conveyance from the Gilberts to Cooper, then he might rely upon that deed for the divestiture of the title to the lot, and the consequent divestiture of any homestead right the Gilberts may have had therein, and it would be subject to sale to satisfy his debt contracted in good faith on what appeared to be the real title of Cooper, which would pass through a sale made under the trust deed."

In the case of Mortgage Co. v. Norton, 71 Tex. 683, 10 S. W. 301, in which the wife had signed the application for the loan, a written designation of homestead, and two mortgages or deeds of trust, and acknowledged them before the proper officer, the supreme court, after reciting the evidence, says:

"It is difficult to attach the term 'fraudulent' to her passive submission to the series of acts dictated and required to perfect the loan for the husband by the agent of the company."

And, again, in the same case, the court says:

"As the constitution denounces as invalid all liens upon the homestead save for purchase money or for improvements made thereon, whether created by the husband alone or together with his wife (article 16, § 50), the holder cannot rely upon such mortgage or trust deed attempting to give a lien. The privy acknowledgment of the wife does not cure the invalidity of a trust deed for a loan upon the homestead. The estoppel, therefore, must be made out by proof of facts outside the instrument itself. It cannot directly or by its recitals bind the homestead."

The case of Heidenheimer v. Stewart, 65 Tex. 321, is this: The appellants, as indorsees of one Alexander, brought suit against Stewart to recover the amount due on a negotiable promissory note executed by Stewart, and to foreclose a lien on a certain tract of land retained as security for the note in a deed from Alexander to Stewart for the land. At the time of and for some time before the execution of this note, the land in question was the homestead of Stewart, who was a married man. He was indebted to Alexander on open account. To secure this debt, Stewart and wife conveyed the land by proper deed, with full warranty, to Alexander, who, on the same day, by like deed, reconveyed the land to Stewart, taking the note sued on, and retaining vendor's lien to secure the note. All this was done in pursuance of a distinct understanding between the parties, and in order to conceal the true character of the transaction which was to secure the pre-existing debt. The court says:

"If the owners of the homestead simulate a transaction in which a negotiable note would be secured by a valid and meritorious lien on the exempt estate, and their artifice succeeds in imposing upon an innocent party, they are estopped from denying the truth of their solemn statements, and cannot be permitted to prove that a lien their acts declared to be valid is void because their acts were false. The constitution prohibits liens on the homestead except for purchase money and improvements. The lien asserted by appellant was for purchase money, if the transaction was genuine, and appellees are estopped as against appellant from proving that it was otherwise. Appellant had no constructive notice of the fact that the deeds were intended to evade the law, for, if the transactions had been as recited, the note would have been secured by a valid lien. That there was no actual no-

tice, which might have arisen from the date of the deeds, the consideration, and registration (Gaston v. Dashield, 55 Tex. 508), was stipulated between the parties in the court below."

In this connection it may be noticed that in Texas the husband not only has control and exclusive power of disposition of his separate estate, but, pending the marriage, has like control and power of disposition of the community property and exclusive management of the wife's separate estate, and, with exceptions not necessary to notice, is a necessary party to all litigation for or against her, which, as a rule, is prosecuted or defended on her behalf under his direction; hence, doubtless, the stipulation as to notice which controlled this Heidenheimer Case.

What is the case before us? On February 24, 1893, the appellant exhibited its bill in the circuit court of the United States against Ferdinand Ganzer, his wife, Helene Ganzer, and others, not now material to mention. The bill showed that appellant is a corporation organized under the laws of England, and that the defendants just named are husband and wife, citizens of Texas, and inhabitants of the district where the suit was brought. It charges that Ferdinand Ganzer had on the 9th day of April, 1889, prepared his written application, addressed to the complainant, in which he solicited a loan of $4,200 for the term of three years, proffering as security lots 1, 2, 3, 4, 5, 6, and 7, in block 847 of Ganzer's addition to the city of Dallas, which he represented to be free from incumbrance, except $2,200, which was to be paid out of this loan. That he occupied no part of the same as his homestead, but occupied lot 8 in said block as his homestead, which lot 8, with its improvements, was worth $8,000. That on 17th of April, 1889, Ganzer and wife executed and filed for record their designation of their homestead, designating the lot number 8, which was then and there actually occupied by them as their homestead. That on the faith of the recitals in the application, and on the faith of this designation of homestead and of their actual occupancy, and of the recitals in a deed of trust that day given by defendants, complainant made the loan asked, taking the deed of trust and a note for $4,200, at three years, with six interest coupons to cover semiannual interest. That the principal note and the three last maturing of the interest coupons are overdue and unpaid. It then declared on this provision in the deed of trust:

"That the herein-described property is not our homestead. That the principal note secured by this deed of trust is given partly for and in lieu of two certain notes executed by J. H. Eberhart to F. Ganzer, both dated the 16th day of November, 1888, one for the sum of $1,200, due 3 years after date, and the other for the sum of $1,000, due 5 years after date, both notes bearing interest at the rate of ten per centum per annum. Said notes were given for part of the purchase price of the lands herein conveyed, to secure which notes the vendor's lien was specially retained. The note secured by this deed of trust is intended in part as an extension of said vendor's lien notes, which, with interest accrued thereon, have been paid off for me, the said Ferdinand Ganzer, and at my special instance and request, by the Western Mortgage and Investment Company, Limited, with the express understanding and agreement that said Co. is thereby subrogated to all the rights of the said Ferdinand Ganzer under said vendor's lien to the extent of the sum so paid by the said Co. for principal and interest of said vendor's lien

notes. That we will pay the said notes and interest thereon as the same becomes due and payable. That we have a good and perfect title in fee simple to the said lands, and have the right to convey the same to the said James B. Simpson, trustee."

—That the note for $4,200 was intended in part as an extension of said vendor's lien notes, which were fully paid off, with the express understanding and agreement that complainant was thereby subrogated to all the rights, legal and equitable, of said Ganzer. The bill prays subpoena to defendants requiring them to answer (without waiving oath to the same), for judgment for principal and interest, for foreclosure of the lien and decree of sale of the premises described in the deed of trust, to satisfy its debt and costs. The defendant Ferdinand Ganzer answered that he was indebted on the $4,200 note, principal and interest. That he is, and was at and long before the time of making said note and deed of trust, a married man. That, at the time and long before the execution of the same, he and his wife owned, occupied, and used the whole of the premises as their homestead, which the agent of complainant, who negotiated the loan, well knew. That about the 14th of November, 1888, he applied to James B. Simpson for a loan of money; and that Simpson, as agent of complainant, stated that he would make the loan for complainant, but requested respondent to comply with certain forms in relation to his homestead property, which he distinctly stated could not be held as security for the loan, but that as a form only he wished it. He advised that a plat of respondent's homestead, then actually occupied and used for homestead purposes, be made and recorded as an addition to East Dallas. That this was made on the 14th of November, and filed for record on the 15th November, 1888, dividing the homestead into eight lots, numbered from 1 to 8. The lots from 1 to 7 included respondent's stable, cow house, chicken house, laundry, and garden, then and ever since in actual use as the homestead of respondent. That Simpson named this "Ganzer's Addition to the City of East Dallas." That it was not made with a view to a sale of any part of the property, but a part of the transaction upon which Simpson proposed to proceed as follows: He directed respondent to select some friend to whom a simulated conveyance of lots from 1 to 7 might be made, to be canceled or the lots to be reconveyed to respondent's wife, if desired, as soon as the loan should be obtained. Respondent suggested a laborer boarding with him, named J. H. Eberhart, who had no means to purchase the property, as Simpson well knew. That Simpson prepared a deed to Eberhart for lots from 1 to 7, reciting a consideration of $5,200,—$3,000 cash, and the two notes, one for $1,200, and one for $1,000, referred to in the bill. That in fact nothing was paid or intended to be paid, and Simpson advised that nothing need ever be paid on account of these formalities. He was willing, as the representative of complainant, to loan the money, and did loan it, on the personal responsibility of respondent; but, to preserve uniformity in his mode of proceeding, desired, as he stated and led respondent to believe, only the form of a conveyance, which should

in no way bind the lots. These papers were executed—the notes by Eberhart and the deed by respondent and wife—on November 16, 1888, and were duly recorded. At the same time Simpson took a deed of trust to himself, as trustee, with power of sale from Eberhart on the same lots. ostensibly to secure the payment of the $1,200 and the $1,000 notes. These notes he retained, and, although they were afterwards settled, they have never been delivered to respondent. That on the 17th of April, 1889, Simpson, for complainant, devised a method of payment of the two notes for $1,200 and $1,000, and for that purpose he agreed to make for complainant a further loan to respondent, to secure which he prepared the mortgage and trust deed and note with coupons declared on in this case, all of which were executed,—the notes by respondent, and the deed of trust by him and wife. About this time, Simpson procured respondent and wife to sign a statement that lot 8, on the plat, was their homestead. The respondent Helene Ganzer adopts her husband's answer, and further says that she signed the trust deed upon the express understanding and agreement that it should not affect the title to her homestead, and that complainant, through its agent, had full knowledge of her homestead rights at and before any and all the transactions detailed in the bill and in the answer of Ferdinand Ganzer. The complainant put in evidence the application, in print and in writing, for the $4,200 loan. This application is not signed by the wife, Helene Ganzer. It is not sworn to by Ferdinand Ganzer. It is made on a printed blank form, twin to the latest improved edition of such corporation literature, with which the legal profession and the courts have become so familiar that they may take notice, as matter of common knowledge, of the labyrinthine intricacies of marginal directions, alternative statements, mostly printed in small type, in crowded lines, and the confusion of short and narrow blank spaces, which any one who has had the benefit of actual experience in filling out in his own behalf knows are apt to mislead and deceive even the elect. This one, like the whole brood, has those statements in reference to homestead which provoked the Texas supreme court to indulge in this sarcasm:

"The wonder is that the borrower was not required to make, and did not make, a further statement that no agent or officer of appellant had capacity to know that land owned and occupied by a husband with his wife as their sole place of residence was their homestead." Loan Co. v. Blalock, 76 Tex. 85, 13 S. W. 12.

Some of its features may help us further on. It values lot No. 8, with its improvements, designated as the homestead, at $8,000. It values lots 1 to 7. proposed for security, with improvements thereon, at $11,000. The appellant's witness Hodge was employed by appellant and paid by appellant to inspect and appraise this proposed security. He did inspect it, for he so testifies, and this application was filled out, he says, "by my partner, Mr. Hoya, under my direction, and Mr. Ganzer. Mr. Ganzer furnished the data for the application, and signed it, and I signed the appraisement attached to the application. This was sent to the complainant at

Kansas City, and the application was approved and the loan made." This witness was 51 years old, and the proprietor of the leading hotel in the city of Dallas, and engaged also in real estate and loan business, at the time he testified, and was so engaged at the time these transactions were had. In his report of appraisement, he values lots 1 to 7, with improvements, at $11,000, and says that, in his best judgment, they would sell at forced sale, at that time, for $8,000 cash; that he had acquired the following information respecting the proposed security and borrower:

"Borrower is O. K., and enjoys a very good reputation. Consider security A No. 1., The statements made in the foregoing report are made on my honor, and embody my opinions on said property as an expert judge of real property values in the city of Dallas.

"Dated this 12th day of April, 1889.

"[Signed]            A. L. Hodge, Appraiser."

Both Ganzer and wife had known Simpson for a number of years; had bought a part of their homestead from him. Ganzer had had several business transactions with Simpson, and alleges in his answer and testifies that Simpson thoroughly knew the property, its continuous use by Ganzer and his wife as their homestead, his business relations and financial condition, and that he had no occasion to make, and did not make, any representations or give any data to Simpson, or to Hodge, who acted in connection with Simpson, in the matter of this loan. Appellant also put in evidence the recorded plat of Ganzer's addition to the city of East Dallas, as follows:

—Also the recorded designation by Ganzer and wife of their homestead; the principal note, with three interest coupons attached, for the $4,200 loan; the deed of trust to secure them, the deed

of trust and note all bearing date April 17, 1889; the two Eberhart notes, of date November 16, 1888; and the depositions of Simpson and Hodge. The respondents made such ample proof in support of their plea that the whole property was in fact homestead, and was at the time of its designation as such of less value than $5,000, that in this court the appellant does not claim that the property is bound beyond the amount of the simulated purchase money notes.

There is not a syllable of proof that the wife, Helene Ganzer, did or said anything in connection with this Eberhart transaction further than the signing and acknowledging her execution of the deed to Eberhart. This she claims to have done under the express understanding that it was not to affect her title to her home, and her claim in this respect seems to be conceded, and appears to be abundantly proved. "If the husband or any really free agent had stated that his signature was merely a matter of form, not intended to be binding, it would have had the effect to give, if possible, additional force to his acts. His statement would be regarded as a confession of fraudulent design. Such imputation cannot, however, be made against the wife, who is supposed to be not well informed of her rights or the effect of her acts." Shelby v. Burtis, supra. It is clear that she is not bound by the act itself (Simpson knowing all the facts), and cannot become bound unless she, and not another, her husband, Eberhart or Simpson, or all three, perpetrated a fraud. Where such an issue is to be found by the jury, the charges should limit the inquiry to the acts of the wife (Mortgage Co. v. Norton, supra); and the chancellor, sitting in equity, must observe the rule which as a judge, sitting at law, he would give to the jury. It may be permitted to repeat from the case last cited:

"It is difficult to attach the term 'fraudulent' to her passive submission [even if it had been] to a series of acts dictated and required to perfect the loan for the husband by the agent of the company."

Moreover, in this case it is not the declaration of the wife that she makes the deed as a matter of form, and is not bound by it, nor is it the declaration of the husband, with whom she joins in making the deed, but it is the statement and express agreement of Simpson, the man for whom the deed to Eberhart is being executed and delivered, and to whom Eberhart's deed of trust is being delivered, and from whom Ganzer is getting the money. May she not plead and testify to and prove this without being charged with conspiracy to commit fraud, with the actual perpetration of fraud, and when fully proved, as it is, will she be bound? And the subject-matter being homestead. if she is not bound, will the husband be bound? Inge v. Cain, 65 Tex. 79. There is on the Eberhart notes not even a pencil memorandum to show that these notes were ever the property of the Scottish-American Mortgage Company. On their face they are payable to the order of Ferdinand Ganzer, at the office of Simpson & Huffman, Dallas, Tex. On the back they are indorsed in blank, "Ferd. Ganzer;" only this, and nothing more. That company is not mentioned in connection with this simulated

unpaid purchase money in Ganzer's application to the appellant for the $4,200 loan. The Scottish-American Mortgage Company is not named in the deed of trust in connection with the paying off of these Eberhart notes; and it is to be remarked that Ganzer, in giving a deed of trust on his own property, does not covenant that his creditor, who has paid off a debt which is held against Ganzer and his land, shall be subrogated to all the rights of the holder of said notes and lien, but the stipulation is that it shall be subrogated to all the rights of the debtor himself, the said Ferdinand Ganzer.

The name of the Scottish-American Mortgage Company is not mentioned in any of the pleadings of the complainant or of the respondents. It is not mentioned in any of the direct or cross interrogatories propounded to the respondents' witnesses, or in any of the answers in their depositions, which were filed in the court below on October 31, 1893. It is not mentioned in any of the interrogatories or cross interrogatories propounded to the appellant's witnesses after the respondents' answers and their depositions and the depositions of their witnesses were all filed in the court below. It is as clear as the sun that up to this time the connection of the Scottish-American Mortgage Company with these Eberhart notes was utterly unknown to the veteran solicitors of the appellant. In the answer of James B. Simpson, taken 7th December, 1893, to one of the interrogatories propounded by the appellant, appear these words: "I bought them [the Eberhart notes] for the Scottish-American Mortgage Company, Limited, of Edinburgh, Scotland." In all the pleadings and in all the evidence there is no other mention of or reference to that company. There is no other proof that such a company exists, or where it has a local habitation, or what relation Simpson then or ever sustained to it, or that it had in Texas or elsewhere any representative, employé, agent, officer, or constituent other than James B. Simpson. Not only so. It is fully proved that Simpson was connected with the appellant from 1884 till 1891; that the money for the $4,200 loan made Ganzer was forwarded to Simpson through the bank of Flippen, Adoue, and Lobit; that Simpson let Ganzer have about $1,800 of that money, and retained the balance, to meet his commissions and charges (for the loan was net to the appellant company), and to pay the Eberhart notes; but there is no whisper of evidence or testimony by or from Simpson, or any other source, that any money on this account—the Eberhart notes—was ever paid to the Scottish-American Mortgage Company, or to any one else, except to James B. Simpson, who knew their simulated character. Ganzer's written application for the $4,200 is dated and was made April 9, was approved April 15, and the loan was to date from April 17, 1889. The notes and deed of trust given to secure it bear date April 17, 1889. The deed of trust was not acknowledged and delivered till May 6, 1889. The date of its filing for record does not appear. The deed from Eberhart and wife conveying the premises to Helene Ganzer, though dated April 28, was not completed by the taking of the wife's acknowledgment till May 7, 1889, on which day it was

filed for record. All of these instruments were doubtless of record before any of the money of this $4,200 loan passed. The instruments ordinarily might be considered contemporaneous, notwithstanding the order of their dates, or of their actual execution and record. But is the order of their dates, actual execution, and record not pregnant with notice to the appellant? Soon after the execution and record of Eberhart's deed, he applied to Simpson for the surrender of the $1,200 and $1,000 notes. Simpson said the notes had not returned from Scotland, which was literally true, for the notes had never gone to Scotland, and hence had not returned. Eberhart demanded a writing showing that the notes had been paid, and Simpson gave Eberhart this certificate:

"Dallas, Texas, May 13th, 1889.

"This is to certify that the two J. H. Eberhart notes—one for $1,000, dated Nov. 16th, 1888, and due 5 years after date, and the other for $1,200, of same date, and due 3 years after date—have been paid off and fully satisfied of this date. These notes are in Europe at present, but, when they are returned, I agree to hand them over to Mr. Eberhart.

"For James B. Simpson,
"Dick Ritchie."

This certificate was made, executed, and delivered to Eberhart, in Simpson's presence, by his direction and dictation. Does it not deserve especial notice that this certificate does not name the Scottish-American Mortgage Company as the holder, to whom payment of these notes had been made, or as the party thereby agreeing and bound to hand them over to Mr. Eberhart? It does not even mention Scotland. It does not purport to be given by Simpson for or on behalf of any other person, natural or incorporated, who had been the innocent holder and owner of these notes. It is given by James B. Simpson, purporting on its face to be only for him and on his own behalf. The fact that Eberhart was willing to receive it, and did receive it, in this shape, shows convincingly that he had no suspicion, as he had no reason to suspect, that Simpson was acting in this matter for an undisclosed principal.

Is the appellant not chargeable with knowledge that the dealing with Eberhart was only a simulated sale? The deed to him stood on the record. His deed of trust to Simpson stood with it. No deed from him to Ganzer, or to Ganzer's wife, or to any other person, appeared there or had been made when Ganzer, in possession of the premises, using all of the same as his homestead, did, in a writing dated and duly signed by him April 9, 1889, with the attached report of A. L. Hodge, dated April 12th, forwarded to Paul Philips, the general manager at Kansas City, by James B. Simpson, and examined and approved by the general manager, April 15, 1889, give the express notice in these plainly-printed words: "The title to the above property is vested in fee simple in the undersigned." If this does not charge the appellant with knowledge, it might be very interesting to learn how notice can be got to the mind of Simpson's principal. The appellant nowhere, in its pleadings or in the proof it offers, seeks to charge Simpson with fraud. It is clear that he committed no fraud on the appellant. He fell into an error of law,—an error persisted in by the appellant until the final action

of the court below was had on this case. Simpson believed and Hodge believed that the platting and recording of the Ganzer addition to the town of East Dallas, and the recording of the written designation of homestead made by Ganzer and wife, were a conclusive abandonment of lots 1 to 7 as part of their homestead, and that, therefore and thereafter, the husband and wife could bind it by their deed of trust to him for the appellant. This appears from Hodge's testimony. He says: "The lots in question adjoin the homestead of Ganzer, which, as designated in their instrument in writing, adjoined the lots in question, but constituted no part of same." Assuming that Simpson bought the Eberhart notes for the Scottish-American Mortgage Company, and waiving the question as to his relation to that company being such as to charge it with his knowledge, it is not so clear that he intended to perpetrate a fraud on it. Ganzer was in good business and credit; was, as Hodge declares on his honor, O. K. as a borrower; and had improved real estate of the value (April 9, 1889) of $19,000, the part of which then valued at $11,000 would have sold at forced sale for $8,000 cash, or nearly three-fourths of its real value, showing that such real estate was then in active demand. May not Simpson, without fraud, have loaned this man $2,200 on his personal responsibility? Assuming (for there is no proof) that Simpson's instructions forbade his purchasing negotiable promissory notes not secured on sufficient real estate, and that, by doing so, he may have made himself liable to his principal, there is not only no proof that Simpson was not amply solvent, but all the fair implications from the proof tend to show that he was good for that amount. Before the first installment of semiannual interest had matured on these notes, Ganzer's half acre being too valuable for a man in his circumstances to hold the whole of it as a homestead, Simpson induced him to do, with the concurrence of his wife, what Simpson believed effected and conclusively evidenced an abandonment as homestead of that part of the premises embraced in lots 1 to 7, and to borrow on the part so abandoned, on mortgage, to the extent of less than 40 per cent. of its value. Simpson still had the Eberhart notes. He never parted with them from the day of their execution till about the time of the institution of this suit, when he delivered them to the solicitors of the appellant. They were to be paid out of this new loan, and this new loan was secured by a valid mortgage, if Simpson was not in error as to these acts of Ganzer and wife conclusively showing an abandonment of that part of their homestead.

From the pleadings and proof in this case, it is clear that Ferdinand Ganzer did not know, and had not the least ground to suspect, that Simpson was representing two different mortgage companies in the making of the two loans. It is true that Ganzer knew that Simpson was representing the appellant in loaning money in Dallas, and he avers and testified that Simpson expressed himself willing, as such representative, to let Ganzer have the first loan on his personal credit, and wished the Eberhart papers for the sake of form; but it is manifest that Ganzer considered that

Simpson was the real party. Ganzer and his wife are plain Germans, born in the fatherland, taught to read and write in their native language. On reaching adult years, they intermarry, and begin life in Dallas county, Tex., not in the city. They have no children. The husband has learned to read and write English; the wife learned to read English, but not to write it. By 1883, having lived then in Dallas county 10 years, they were able to buy a part of the half acre that now constitutes their homestead. It had no house on it, and they had not then the means to pay for erecting a dwelling house on it; but it was purchased for a home place, and, as soon as practicable, they commenced improving it for that purpose, erecting first stables and cowhouse and an outhouse used as a washhouse; and in 1886 they were able to build, and did erect, a house thereon for their dwelling, which they then commenced and still continue to use as their dwelling. The first part of this half-acre lot was acquired October 2, 1883; the last part, March 8, 1888; and at the cost for the whole of about $1,-200. They had both known James B. Simpson for a number of years. A part of their home lot was purchased from Simpson. He was a practicing attorney, of experience and skill, engaged also and largely in the business of loaning money. To them he was the great lawyer, with untold wealth to lend; and he was held by them in that honor which, in their native land, honest yeomen accord to worthy eminent men. The rest of this picture presented by the record has already been drawn.

In this investigation the effort has been to soak the mind with the record, eliminating color. In the opening of this opinion, reference was made to the office and effect of perspective. It may now be permitted to suggest that the view of this case taken by the majority of this court illustrates the power and value of perspective. It is respectfully submitted that the distinction drawn in the opinion of the court by which the corporation claimed to be the principal in the purchase of the Eberhart notes by Simpson is to escape from being charged with his knowledge finds no support in the opinion of the supreme court in the Distilled Spirits Case, 11 Wall. 367. The citations from the American & English Encyclopedia of Law are not accessible at this writing, but do not seem to require notice. The distinction drawn by the majority of the court in this case may rest on a refinement in casuistry fit to have exercised the fancy of the schoolmen, but one which the judgment of a superior court, charged to administer the Texas homestead exemption law, should reject. Much of the money-seeking investment on mortgage security in Texas is owned by aliens or by citizens of other states. It is now the vogue there, as elsewhere, to effect such investments through mortgage companies. Citizens of that state desiring to invest money there on such security will have easy opportunity, of which they will not be slow to avail themselves, to make their investments through incorporated mortgage companies, created by or under the laws of some foreign country or of some other state of this Union. If the views expressed in the opinion of the court in this case are to become its settled doctrine, the United

States courts in Texas will enjoy a monopoly of all similar suits in which the matter involved is of value sufficient to support their jurisdiction. Cases like Ivory v. Kennedy, 6 C. C. A. 371, 57 Fed. 340, may not occur so often, but cases like this will abound. The evil intended to be excluded is the object of the tempter's arts, and subjects not proof against his beguiling wiles will be charmed into the snare. The barrier of the constitution will be withdrawn, for the doctrine of notice, as held and applied in this case, will practically exempt incorporated mortgage companies from the operaation of that organic law.